In the matter of the application of Mrs. MYRA BRAD-
WELL, for a license to practice law.*

1. ATTORNEY AT LAW—*whether women, married or single, can be licensed
as such.* The ruling in the case of *Carpenter et al.* v. *Mitchell*, 50 Ill. 470,
that the act of 1861, securing to married women the enjoyment of their
separate property, gave to them no power to contract, except as to matters
incident to, and growing out of, their right to hold and enjoy their sepa-
rate property, is adhered to.

2. So, even under the modifications of the rules of the common law on
that subject, made by the act of 1861, a married woman would be bound
neither by her express contracts, nor by those implied contracts which it
is the policy of the law to create between attorney and client, and, there-
fore, if for no other reason, a married woman could not be granted a license
to practice as an attorney at law in this State.

3. But apart from the disability arising from coverture, no woman, mar-
ried or single, can be admitted, under the laws of this State, to practice as
an attorney at law.

Application of Mrs. Myra Bradwell for a license to practice
law.

Mrs. MYRA BRADWELL presented an argument in her own
behalf.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

At the last term of the court, Mrs. Myra Bradwell applied
for a license as an attorney at law, presenting the ordinary cer-
tificates of character and qualifications.    The license was
refused, and it was stated, as a sufficient reason, that under
the decisions of this court, the applicant, as a married woman,
would be bound neither by her express contracts, nor by those

---

*This application was finally heard and determined at the September Term, 1869,
but was unavoidably omitted from its proper place in the report of the cases
decided at that term.

implied contracts, which it is the policy of the law to create between attorney and client.

Since the announcement of our decision, the applicant has filed a printed argument, in which her right to a license is earnestly and ably maintained. Of the qualifications of the applicant we have no doubt, and we put our decision in writing in order that she, or other persons interested, may bring the question before the next legislature.

The applicant, in her printed argument, combats the decision of this court in the case of *Carpenter* v. *Mitchell*, 50 Ill. 470, in which we held a married woman was not bound by contracts having no relation to her own property. We are not inclined to go over again the grounds of that decision. It was the result of a good deal of deliberation and discussion in our council chamber, and the confidence of the present members of this court in its correctness cannot easily be shaken. We are in accord with all the courts in this country which have had occasion to pass upon a similar question, the supreme court of Wisconsin, in *Conway* v. *Smith*, 13 Wis. 125, differing from us only on the minor point, as to whether, in regard to contracts concerning the separate property of married women, the law side of the court would take jurisdiction.

As to the main question, the right of married women to make contracts not affecting their separate property, the position of those who assert such right is, that because the legislature has expressly removed the common law disabilities of married women in regard to holding property not derived from their husbands, it has, therefore, by necessary implication, also removed all their common law disabilities in regard to making contracts, and invited them to enter, equally with men, upon those fields of trade and speculation by which property is acquired through the agency of contracts. The *hiatus* between the premise and conclusion is too wide for us to bridge. It may be desirable that the legislature should relieve married women from all their common law disabilities. But to say that it has done so, in the act of 1861, the language of

which is carefully guarded, and which makes no allusion to
contracts, and does not use that or any equivalent term, would
be simple misinterpretation. It would be going as far beyond
the meaning of that act as that act goes beyond the common
law in changing the legal status of women. The act itself is
wise and just, and therefore entitled to a liberal interpretation.
This we have endeavored to give it in the cases that have
come before us, but we do not intend to decide that the legis-
lature has gone to a length in its measure of reform for which
the language it has carefully used furnishes no warrant.

It is urged, however, that the law of the last session of the
legislature, which gives to married women the separate control
of their earnings, must be construed as giving to them the
right to contract in regard to their personal services. This act
had no application to the case of *Carpenter* v. *Mitchell*, having
been passed after that suit was commenced, and we were
unmindful of it when considering this application at the last
term. Neither do we now propose to consider how far it
extends the power of a married woman to contract, since, after
further consultation in regard to this application, we find our-
selves constrained to hold that the sex of the applicant, inde-
pendently of coverture, is, as our law now stands, a sufficient
reason for not granting this license.

Although an attorney at law is an agent, as is claimed by
the applicant's argument, when he has been retained to act for
another, yet he is also much more than an agent. He is an
officer of the court, holding his commission, in this State, from
two of the members of this court, and subject to be disbarred
by this court for what our statute calls "mal-conduct in his
office." He is appointed to assist in the administration of
justice, is required to take an oath of office, and is privileged
from arrest while attending courts.

Our statute provides that no person shall be permitted to
practice as an attorney or counsellor at law without having
previously obtained a license for that purpose from two of the
justices of the supreme court. By the second section of the

act, it is provided that no person shall be entitled to receive a license, until he shall have obtained a certificate from the court of some county of his good moral character, and this is the only express limitation upon the exercise of the power thus entrusted to this court. In all other respects it is left to our discretion to establish the rules by which admission to this office shall be determined. But this discretion is not an arbitrary one, and must be exercised subject to at least two limitations. One is, that the court should establish such terms of admission as will promote the proper administration of justice; the second, that it should not admit any persons or class of persons who are not intended by the legislature to be admitted, even though their exclusion is not expressly required by the statute.

The substance of the last limitation is simply that this important trust reposed in us should be exercised in conformity with the designs of the power creating it. Whether, in the existing social relations between men and women, it would promote the proper administration of justice, and the general well being of society, to permit women to engage in the trial of cases in court, is a question opening a wide field of discussion upon which it is not necessary for us to enter.

It is sufficient to say that, in our opinion, the other implied limitation upon our power, to which we have above referred, must operate to prevent our admitting women to the office of attorney at law.

If we were to admit them, we should be exercising the authority conferred upon us in a manner which, we are fully satisfied, was never contemplated by the legislature. Upon this question, it seems to us neither this applicant herself, nor any unprejudiced and intelligent person, can entertain the slightest doubt.

It is to be remembered that at the time this statute was enacted, we had, by express provision, adopted the common law of England, and, with three exceptions, the statutes of that country passed prior to the fourth year of James the First, so far as they were applicable to our condition.

It is to be also remembered that female attorneys at law were unknown in England, and a proposition that a woman should enter the courts of Westminster Hall in that capacity, or as a barrister, would have created hardly less astonishment than one that she should ascend the bench of Bishops, or be elected to a seat in the House of Commons.

It is to be further remembered that when our act was passed, that school of reform, which claims for women participation in the making and administering of the laws had not then arisen, or, if here and there a writer had advanced such theories, they were regarded rather as abstract speculations than as an actual basis for action. That God designed the sexes to occupy different spheres of action, and that it belonged to men to make, apply and execute the laws, was regarded as an almost axiomatic truth.

It may have been a radical error, but that this was the universal belief certainly admits of no denial. A direct participation in the affairs of government, in even the most elementary form, namely, the right of suffrage, was not then claimed, and has not yet been conceded, unless recently, in one of the newly settled territories of the west.

In view of these facts, we are certainly warranted in saying, that when the legislature gave to this court the power of granting licenses to practice law, it was with not the slightest expectation that this privilege would be extended equally to men and women. Neither has there been any legislation since that period, which would justify us in presuming a change in the legislative intent. Our laws, to-day, in regard to women, are substantially what they have always been, except in the change wrought by the acts of 1861 and 1869, giving to married women the right to control their own property and earnings.

Whatever, then, may be our individual opinions as to the admission of women to the bar, we do not deem ourselves at liberty to exercise our power in a mode never contemplated by the legislature, and inconsistent with the usages of courts of

the common law, from the origin of the system to the present day.

But it is not merely an immense innovation in our own usages, as a court, that we are asked to make. This step, if taken by us, would mean that, in the opinion of this tribunal, every civil office in this State may be filled by women; that it is in harmony with the spirit of our constitution and laws that women should be made governors, judges and sheriffs. This we are not yet prepared to hold.

In our opinion, it is not the province of a court to attempt, by giving a new interpretation to an ancient statute, to introduce so important a change in the legal position of one-half the people. Courts of justice were not intended to be made the instruments of pushing forward measures of popular reform. If it be desirable that those offices which we have borrowed from the English law, and which, from their origin, some centuries ago, down to the present time, have been filled exclusively by men, should also be made accessible to women, then let the change be made, but let it be made by that department of the government to which the constitution has entrusted the power of changing the laws.

The great body of our law rests merely upon ancient usage. The right of a husband in this State to the personal property of his wife, before the act of 1861, rested simply upon such usage, yet who would have justified this court, if, prior to the passage of that act, it had solemnly decided that it was unreasonable that the property of the wife should vest in the husband, and this usage should no longer be recognized? Yet was it not as unreasonable that a woman by marriage should lose the title of her personal property, as it is that she should not receive from us a license to practice law? The rule in both cases, until the law of 1861, rested upon the same common law usage, and could have pleaded the same antiquity.

In the one case it was never pretended that this court could properly overturn the rule, and we do not see how we could be justified should we disregard it in the other.

The principle can not be too strictly and conscientiously observed, that each of the three departments of the government should avoid encroachment upon the other, and that it does not belong to the judiciary to attempt to inaugurate great social or political reforms. The mere fact that women have never been licensed as attorneys at law is, in a tribunal where immemorial usage is as much respected as it is and ought to be in courts of justice, a sufficient reason for declining to exercise our discretion in their favor, until the propriety of their participating in the offices of State and the administration of public affairs shall have been recognized by the law-making department of the government,—that department to which the initiative in great measures of reform properly belongs.

For us to attempt, in a matter of this importance, to inaugurate a practice at variance with all the precedents of the law we are sworn to administer, would be an act of judicial usurpation, deserving of the gravest censure. If we could disregard, in this matter, the authority of those unwritten usages which make the great body of our law, we might do so in any other, and the dearest rights of person and property would become a matter of mere judicial discretion.

But it is said the twenty-eighth section of chapter 90 of the revised statutes of 1845 provides that, whenever any person is referred to in the statute by words importing the masculine gender, females, as well as males, shall be deemed to be included.

But the thirty-sixth section of the same chapter provides that this rule of construction shall not apply when there is anything in the subject or context repugnant to such construction. That is the case in the present instance.

In the view we have taken of this question, the argument drawn by the applicant from the constitution of the United States has no pertinency.

In conclusion, we would add that, while we are constrained to refuse this application, we respect the motive which prompts it, and we entertain a profound sympathy with those efforts

which are being so widely made to reasonably enlarge the field for the exercise of woman's industry and talent. While those theories which are popularly known as "woman's rights" can not be expected to meet with a very cordial acceptance among the members of a profession, which, more than any other, inclines its followers, if not to stand immovable upon the ancient ways, at least to make no hot haste in measures of reform, still, all right minded men must gladly see new spheres of action opened to woman, and greater inducements offered her to seek the highest and widest culture.

There are some departments of the legal profession in which she can appropriately labor. Whether, on the other hand, to engage in the hot strifes of the bar, in the presence of the public, and with momentous verdicts the prizes of the struggle, would not tend to destroy the deference and delicacy with which it is the pride of our ruder sex to treat her, is a matter certainly worthy of her consideration.

But the important question is, what effect the presence of women as barristers in our courts would have upon the administration of justice, and the question can be satisfactorily answered only in the light of experience.

If the legislature shall choose to remove the existing barriers, and authorize us to issue licenses equally to men and women, we shall cheerfully obey, trusting to the good sense and sound judgment of women themselves, to seek those departments of the practice in which they can labor without reasonable objection.

*Application denied.*