### *In re* APPLICATION OF HENRY M. DAY *et al.* FOR ADMISSION TO THE BAR.

*Opinion filed June 19, 1899—Rehearing denied October 6, 1899.*

1. STATUTES—*retrospective operation is not favored in construing statutes.* If it is doubtful as to whether a statute was intended by the legislature to have prospective or retrospective operation, courts will construe it as being prospective only.

2. SAME—*the true office of a proviso is to qualify, and not to enlarge, the enacting clause.* The legitimate office of a proviso is to limit, restrain or qualify the enacting clause or except something from its operation, and not to enlarge the enacting clause by conferring substantial rights not therein granted.

3. ATTORNEYS AT LAW—*act of 1899, for admission to the bar, construed.* The provision of the act of 1899, on attorneys, (Laws of 1899, p. 81,) which specifies that applicants for admission to the bar shall be granted licenses who have complied with the rules of the Supreme Court in force at the time they began the study of law, notwithstanding subsequent changes, has prospective operation only, and is of no force as regards the change in Supreme Court rules made November 4, 1897.

4. SAME—*law regulating admission to bar must be general.* The right to practice law is a privilege, and any law which attempts to prescribe the conditions under which a license to practice law shall be granted must be general in its operation, and any classification adopted must have a reasonable basis and not be purely arbitrary.

5. SAME—*proviso to section 1 of act of 1899, on attorneys, is special legislation.* The proviso to section 1 of the act of 1899, on attorneys, which entitles the holder of a diploma of a law school having a two years' course, which shows that the holder began the study of law prior to November 4, 1897, to a license to practice law, is unconstitutional, being special legislation, based upon an arbitrary and unreasonable classification. (PHILLIPS and BOGGS, JJ., dissenting.)

6. SAME—*power to prescribe qualifications of attorneys is judicial.* An attorney is an officer of the court, and the power to prescribe the qualifications which will entitle an applicant for admission to the bar to a license is judicial, and not legislative. (PHILLIPS and BOGGS, JJ., dissenting.)

7. SAME—*right of legislature to regulate admission to the bar.* Under its general police power the legislature may prescribe reasonable conditions which will exclude from the right to practice law those persons through whom injurious consequences are likely to result to the inhabitants of the State.

8. SAME—*proviso to section 1 of act of 1899, on attorneys, is unconstitutional.* The proviso to section 1 of the act of 1899, on attorneys, which relates to the admission to the bar of holders of diplomas in law schools having a two years' course, etc., is in violation of article 3 of the constitution, concerning the division of governmental powers. (PHILLIPS and BOGGS, JJ., dissenting.)

APPLICATION for license to practice law.

HAMLINE, SCOTT & LORD, and WILLIAM BARGE, for applicants:

At common law, and now, the only way an advocate can become a member of the bar of England was and is by being called by the inns of lawyers of which he has become a member. Weeks on Attorneys, secs. 14-22.

The power of the English courts to admit attorneys is derived solely from statutes, and is not inherent. Glanville, b. 11, ch. 3; *Cooper's case,* 22 N. Y. 90; 1 Reeves, 169; 2 Inst. 249, 250; Register of Writs, 20, 22; Bacon's Abr. tit. "Attorney," pt. 1; Coke's Litt. 128 *a*, sec. 196; Petersdorff's Abr. tit. "Attorney;" Mirror of Justice, 100, 249.

As to barristers: Pearce's Inns of Court, 60; 4 Reeves' Hist. Eng. Law, 573, 574; Fortescue de Laudibus, 180, 188; *King* v. *Benchers of Lincoln's Inn,* 4 B. & C. 855.

The power of clients to appoint attorneys and courts to regulate their admission is statutory. 2 Reeves' Hist. 285, 297, 169; 4 id. 76; 3 id. 233; 2 Coke's Inst. 250, 377, 378; *Beecher's case,* 8 Co. 58; 12 Edw. II, ch. 1; 21 Edw. III, 41; 9 id. 6; 3 Edw. I, ch. 42; Henry VII, 27; 21 Hen. 30; 4 Inst. 101; 8 Henry IV, 62; Fitz. N. B. 60, 61, 63; 2 Henry VI, 11; 3 id. 55; 7 Edw. IV, 9 *a*; 12 Henry VII, 9; Dawson on Law of Attorneys, introd. 7; Maugham on Law of Attorneys, 9; 1 Roll, 3; 4 Henry IV, ch. 18; 20 Henry VI, 372; Crabbe's Eng. Law, 351.

The legislature of Illinois in 1819 conferred the power to license upon two of the members of the Supreme Court and the power to disbar upon the full bench, and this source of power has been assumed by the legislature and

recognized by this court for eighty years.    Acts of 1819, p. 9; Rev. Stat. 1845, p. 72; Rev. Stat. 1874, p. 169; Laws of 1833, p. 100.

'·A contemporaneous legislative construction of a constitutional provision is entitled to great deference. *Phœbe* v. *Jay*, Breese, 268; 4 Bacon's Abr. stat. 648; Sedgwick on Stat. and Const. Law, 412; *Cohens* v. *Virginia*, 6 Wheat. 264.

All power not delegated to the executive or judicial department is reserved to the legislative. *Field* v. *People*, 3 Scam. 79; *People* v. *Wilson*, 15 Ill. 391.

Neither the constitution of 1818, of 1845 or of 1870 invests the Supreme Court with the power of licensing attorneys or regulating admissions to the bar.    The legislature, in declaring what shall constitute a person an attorney and entitle him to practice in courts of record, exercises the police power over which it has absolute control.    *Robb* v. *Smith*, 3 Scam. 46.

The power of two judges to license is derived from the legislature, and is subject to be limited, changed or taken away by the legislature.    *In re Bradwell*, 55 Ill. 535.

The power to disbar does not inhere in the courts, but is the creation of the legislature. The circuit courts have no such power, and had no power to suspend until 1874. Rev. Stat. 1874, sec. 6, p. 170; *Winkleman* v. *People*, 50 Ill. 449; *People* v. *Sanborn*, 1 Scam. 123; *In re Fellows*, 2 id. 369; *People* v. *Coe*, 84 Ill. 327; *People* v. *Palmer*, 61 id. 255; *People* v. *Goodrich*, 79 id. 148; *People* v. *Moutray*, 166 id. 630.

In other States the source of the court's power to license is recognized to be the legislature.    *Cooper's case*, 22 N.Y. 67; *Ex parte Yale*, 24 Cal. 241; *Percy's case*, 36 N.Y. 651; *In the matter of an Attorney*, 83 id. 164; *In re Beggs*, 67 id. 120; *In re Thomas*, 16 Col. 441; *Commonwealth* v. *Judges*, 1 S. & R. 187; *In re Hall*, 50 Conn. 131; *In re Leach*, 134 Ind. 665; 3 Am. & Eng. Ency. of Law, (2d ed.) 287.

Cases cited to establish the inherent and exclusive power of the courts to admit and disbar are chiefly Federal cases.    They do not support that proposition.

The statute is not special legislation. *Vogel* v. *Pekoc,* 157 Ill. 339; *People* v. *Wright,* 70 id. 308; *Hawthorn* v. *People,* 109 id. 302; *Potwin* v. *Johnson,* 108 id. 70; *Railway Co.* v. *People,* 144 id. 458; *Cummings* v. *Chicago,* id. 563; *Coughlin* v. *People,* id. 140.

BLEWETT LEE, and A. M. PENCE, for objectors:

The admission of attorneys is a part of the judicial power. Const. 1870, art. 3.

The history of admission to the bar: Maugham on Attorneys, 5, 10, 15-20, 55, 57; *Ricker's case,* 66 N. H. 207; 3 Blackstone's Com. 26, 28; 1 Pollock & Maitland's Hist. of Eng. Law, 190, 192, 194-196; Laws of N. W. Terr. 1792, p. 40, chap. 10, sec. 1; 2 Wilson's Works, (Andrews' ed.) 247; Laws of Indiana Terr. 1807, p. 162; Laws of Illinois Terr. (1st sess.) 5; 1 id. 58.

An attorney is an officer of the court. *Ex parte Garland,* 4 Wall. 333; *In re Bradwell,* 55 Ill. 535; 3 Am. & Eng. Ency. of Law, (2d ed.) 283; *Vise* v. *County of Hamilton,* 19 Ill. 78.

His admission is an act of *quasi* public character, to which any person may object. *Ex parte Walls,* 73 Ind. 95; *In re Burchard,* 27 Hun, 429.

His admission is a judicial act. 3 Am. & Eng. Ency. of Law, (2d ed.) 287; *Ex parte Secombe,* 19 How. 9; *Petition of Splane,* 123 Pa. St. 527; *Randall* v. *Brigham,* 7 Wall. 523; *Commonwealth* v. *Judges,* 1 S. & R. 187; Weeks on Attorneys, (2d ed.) 157; *Goodell's case,* 39 Wis. 232; *In re Mosness,* 39 id. 509.

Conversely, his disbarment is a judicial act. 3 Am. & Eng. Ency. of Law, (2d ed.) 300; 4 Henry IV, chap. 18; *Ex parte Robinson,* 19 Wall. 505; *State* v. *Judge,* 49 La. Ann. 1015; Weeks on Attorneys, (2d ed.) 154; *Moutray* v. *People,* 162 Ill. 194; *Missouri River Tel. Co.* v. *Bank,* 74 id. 217.

The legislature cannot constitutionally impair the judicial power. *Houston* v. *Williams,* 13 Cal. 24; *Vaughn* v. *Harper,* 49 Ark. 160; *Ex parte Griffiths,* 118 Ind. 83.

The same principle is applied in case of laws regulating punishment of contempt of court. 6 Am. & Eng. Ency. of Law, (2d ed.) 1048.

The appointment of assistants to the court cannot be controlled by the legislature. *State* v. *Noble*, 118 Ind. 350; 6 Am. & Eng. Ency. of Law, (2d ed.) 1047; *In re Janitor of Supreme Court*, 35 Wis. 410.

The act of February 21, 1899, is an assumption by the legislature of judicial power.

Rules of court are simply general orders. *Owens* v. *Ranstead*, 22 Ill. 161.

The legislature cannot prescribe conclusive rules of evidence. *Marks* v. *Hawthorne*, 148 U. S. 172; *Wantland* v. *White*, 19 Ind. 470; Cooley's Const. Lim. (3d ed.) 46; 6 Am. & Eng. Ency. of Law, (2d ed.) 1050; *Matter of Cooper*, 22 N. Y. 67.

The act of February 21, 1899, is special legislation, and denies the equal protection of the laws. Const. 1870, art. 4, sec. 22; U. S. Const. 14th amend. sec. 1; *Harding* v. *People*, 160 Ill. 459; *Railroad Co.* v. *Ellis*, 165 U. S. 150; *In re Burchard*, 27 Hun, 429.

LESSING ROSENTHAL, also for objectors.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

This is an application to this court for admission to the bar of this State by virtue of diplomas from law schools issued to the applicants. The act of the General Assembly passed in 1899, under which the application is made, is entitled "An act to amend section 1 of an act entitled 'An act to revise the law in relation to attorneys and counselors,' approved March 28, 1874, in force July 1, 1874." The amendment, so far as it appears in the enacting clause, consists in the addition to the section of the following: "And every applicant for a license who shall comply with the rules of the Supreme Court in regard to

admission to the bar in force at the time such applicant commenced the study of law, either in a law office or a law school or college, shall be granted a license under this act, notwithstanding any subsequent changes in said rules." The eminent counsel who have argued the motion for admission on behalf of the applicants say that this provision, and all of the section preceding the proviso hereinafter mentioned, is prospective in its nature, and that it concedes to this court the power to make and change rules for admission to the bar, but annexes the additional requirement that when it does change them in the future, any one who has commenced the study of law at the time of the change may have a license by complying with the rules for admission in force at the time such applicant commenced such study. They say that, so far as that provision goes, it means only that new rules hereafter made "must be prospective and must not affect so-called inchoate rights." In this position counsel are unquestionably correct. A retrospective operation is not favored, and a statute will be construed to have a prospective effect if such a conclusion is permissible. If the real design of the statute in that respect is doubtful it will be construed to have a prospective operation only, and a retrospective effect will not be given to it unless it clearly appears that such was the intention of the legislature. (*McHaney* v. *Trustees of Schools*, 68 Ill. 140; *United States Mortgage Co.* v. *Gross*, 93 id. 483; *People* v. *Peacock*, 98 id. 172; *Means* v. *Harrison*, 114 id. 248.) In this case no intention to make the enactment retrospective is expressed, but such an intention is clearly negatived by the attempt to legislate for those affected by the change already made under the form of a proviso. And further, if the enactment were retrospective, students to be examined would go to the Appellate Court, while the proviso sends them to the examining board. To hold it retrospective would make the proviso repugnant to it. The provision quoted, therefore, operates only as a rule for

the future, and does not confer the rights claimed on this application. The change in the rules for admission to the bar made November 4, 1897, and the rules themselves, are unaffected by that provision, and counsel for applicants rest their claim wholly upon the proviso following such provision. After said provision there is a double proviso, one branch of which is that up to December 31, 1899, this court shall grant a license of admittance to the bar to the holder of every diploma regularly issued by any law school regularly organized under the laws of this State whose regular course of law studies is two years and requiring an attendance by the student of at least thirty-six weeks in each of such years, and showing that the student began the study of law prior to November 4, 1897, and accompanied with the usual proofs of good moral character. The other branch of the proviso is that any student who has studied law for two years in a law office, or part of such time in a law office "and part in the aforesaid law school," and whose course of study began prior to November 4, 1897, shall be admitted upon a satisfactory examination by the examining board in the branches now required by the rules of this court. If the right to admission exists at all, it is by virtue of the proviso which, it is claimed, confers substantial rights and privileges upon the persons named therein and establishes rules of legislative creation for their admission to the bar. Now, the office of a proviso is to qualify or limit the enactment itself, and not to enlarge the enacting clause. "The office of a proviso, generally, is either to except something from the enacting clause, to qualify or restrain its generality, or to exclude some possible ground of misinterpretation of its extending to cases not intended to be brought within its purview." (Potter's Dwarris on Statutes, 118, note 11.) It is intended to qualify what is affirmed in the body of the act, section or paragraph preceding it. (*Boone* v. *Juliet*, 1 Scam. 258; *Sarah* v. *Borders*, 4 id. 341; *Huddleston* v. *Francis*, 124 Ill. 195; *City of Chicago*

v. *Phœnix Ins. Co.* 126 id. 276; *Voorhees* v. *Bank of the United States,* 10 Pet. 449.) This proviso, instead of excepting something from the enactment or qualifying it in some way, attempts to enlarge the enactment to which it is appended and is designed to operate as a substantive enactment itself. That is not the legitimate office of a proviso. There is authority, however, for holding that the intention of the legislature, if plainly expressed, is to have the force of law although in the form of a proviso, and we will treat this proviso as an enactment in itself.

Considering the proviso as such an enactment, it is clearly special legislation, prohibited by the constitution, and invalid as such. If the legislature had any right to admit attorneys to practice in the courts and take part in the administration of justice, and could prescribe the character of evidence which should be received by the court as conclusive of the requisite learning and ability of persons to practice law, it could only be done by a general law, and not by granting special and exclusive privileges to certain persons or classes of persons. (Const. art. 4, sec. 22.) The right to practice law is a privilege, and a license for that purpose makes the holder an officer of the court, and confers upon him the right to appear for litigants, to argue causes and to collect fees therefor, and creates certain exemptions, such as from jury service and arrest on civil process while attending court. The law conferring such privileges must be general in its operation. No doubt the legislature, in framing an enactment for that purpose, may classify persons so long as the law establishing classes is general and has some reasonable relation to the end sought. There must be some difference which furnishes a reasonable basis for different legislation as to the different classes, and not a purely arbitrary one, having no just relation to the subject of the legislation. (*Braceville Coal Co.* v. *People,* 147 Ill. 66; *Ritchie* v. *People,* 155 id. 98; *Gulf, Colorado and Santa Fe Railroad Co.* v. *Ellis,* 165 U. S. 150.) The length

of time a physician has practiced and the skill acquired by experience may furnish a basis for classification, (*Williams* v. *People*, 121 Ill. 84,) but the place where such physician has resided and practiced his profession cannot furnish such basis and is an arbitrary discrimination, making an enactment based upon it void. (*State* v. *Pennoyer*, 65 N. H. 113.) Here, the legislature undertakes to say what shall serve as a test of fitness for the profession of the law, and, plainly, any classification must have some reference to learning, character or ability to engage in such practice. The proviso is limited, first, to a class of persons who began the study of law prior to November 4, 1897. This class is subdivided into two classes: First, those presenting diplomas issued by any law school of this State before December 31, 1899; and second, those who studied law for the period of two years in a law office, or part of the time in a law school and part in a law office, who are to be admitted upon examination in the subjects specified in the present rules of this court; and as to this latter subdivision there seems to be no limit of time for making application for admission. As to both classes the conditions of the rules are dispensed with, and, as between the two, different conditions and limits of time are fixed. No course of study is prescribed for the law school, but a diploma granted upon the completion of any sort of course its managers may prescribe is made all-sufficient. Can there be anything with relation to the qualifications or fitness of persons to practice law resting upon the mere date of November 4, 1897, which will furnish a basis of classification? Plainly not. Those who began the study of law November 4 could qualify themselves to practice in two years as well as those who began on the 3d. The classes named in the proviso need spend only two years in study, while those who commenced the next day must spend three years, although they would complete two years before the time limit. The one who commenced on the 3d, if possessed

181—6

of a diploma, is to be admitted without examination be-
fore December 31, 1899, and without any prescribed course
of study, while as to the other the prescribed course must
be pursued and the diploma is utterly useless. Such
classification cannot rest upon any natural reason or
bear any just relation to the object sought, and none is
suggested. The proviso is for the sole purpose of be-
stowing privileges upon certain defined persons. It is
not a mere change of system at a given date, but it rec-
ognizes the change made and the power of the court to
make future changes subject to a certain restriction, and
legislates for a particular class. Students who began
before and after November 4, 1897, were pursuing their
studies when it was passed, and those who began after
that date and before December 31, 1897, will complete
two years before December 31, 1899, but cannot enjoy its
privileges.

Another fatal objection to the provisions in question
is that the legislature, in its enactment, overlooked the
restraint imposed by the constitution and assumed the
exercise of a power properly belonging to the courts. A
provision which has been incorporated in each successive
constitution of this State is found in the present consti-
tution as article 3, in the following language: "The pow-
ers of the government of this State are divided into three
distinct departments—the legislative, executive and ju-
dicial; and no person or collection of persons, being one
of these departments, shall exercise any power properly
belonging to either of the others, except as hereinafter
expressly directed or permitted." To this question the
greater part of the argument of the learned counsel on
each side has been directed, and the history of the exer-
cise of such power in England has been very carefully
set forth. That history is very interesting, but is of little
benefit in determining whether the power is one properly
belonging to courts or to the legislature. The difference
in the principles underlying the systems of government

is such as to render a conclusion inapplicable even if it should be found that parliament had exercised such power. Judge Cooley, in his great work on Constitutional Limitations, points out that while it is natural that we should recur to the powers of parliament and incline to concede, without reflection, that whatever the legislature of the country from which we derived our laws could do might also be done by the legislative authority in this country, we should bear in mind the important distinction that parliament may exercise all the powers of government while the legislature can exercise but one. (Cooley's Const. Lim. 102.) He says further (p. 104): "So long as the parliament is recognized as rightfully exercising the sovereign authority of the country, it is evident that the resemblance between it and American legislatures in regard to their ultimate powers cannot be traced very far. The American legislatures only exercise a certain portion of the sovereign power. The sovereignty is in the people, and the legislatures which they have created are only to discharge a trust of which they have been made a depository, but with well-defined restrictions. Upon this difference it is to be observed, that while parliament, to any extent it may choose, may exercise judicial authority, one of the most noticeable features in American constitutional law is the care taken to separate legislative, executive and judicial functions. * * * But the grant of the judicial power to the department created for the purpose of exercising it must be regarded as an exclusive grant covering the whole power, subject only to the limitations which the constitutions impose and to the incidental exceptions before referred to. While, therefore, the American legislatures may exercise the legislative powers which the parliament of Great Britain wields, except as restrictions are imposed, they are at the same time excluded from other functions which may be, and sometimes habitually are, exercised by the parliament." Whatever the English practice may have been,

the question must be what the nature of the power is, and whether it is one which naturally pertains to the courts. If it is judicial in its nature the legislatures are expressly prohibited from exercising it.

The history of the admission of attorneys in England, however, does not justify the claim that it is the exercise of the legislative function, but utterly refutes it. In that country the legal profession has been divided into classes which do not exist here. One class embraced what were known as attorneys when their practice was in the courts of common law, solicitors when it was in chancery, and proctors in the admiralty and ecclesiastical courts, all of whom at all times must have been admitted to the courts upon examination regarding their fitness, and this power no other department of government ever sought to control. Originally, no one could appear by attorney without the special warrant of the king, issuing out of chancery or under seal, granting the privilege. The king was considered the fountain of justice, and as he could not in person decide all controversies and remedy all wrongs, the injured parties were referred to the proper forum and writs were framed in his name to his judges. Suits were begun in that way, and when he granted the privilege in question it was as a part of that system and not in a legislative capacity. In a civilized country, where the rights of persons were to be determined in accordance with established rules, either statutory or promulgated by the courts, the employment of persons acquainted with those rules became a necessity both to the parties and the court. Persons unlearned in the law can neither aid a litigant nor the court, and parliament at different times extended the right of the litigant to appoint an attorney to represent him in court. (Maugham on Attorneys, appendix, 6, 7.) In 1292 Edward I made an order by which he appointed the lord chief justice of the court of common pleas and the rest of his fellow-justices of that court, that they, according to their discretion, should provide

and ordain from every county certain attorneys and apprentices, of the best and most apt for their learning and skill, who might do service to his court and people, and those so chosen only, and no other, should follow his court and transact the affairs thereof, the said king and his counsel then deeming the number of seven score to be sufficient for that employment, but it was left to the discretion of the said justices to add to that number or diminish, as they should see fit. (1 Pollock & Maitland's History of English Law, 194; Dugdale's Orig. Jurid. 141.) The profession of attorney was placed under the control of the judges, and the discretion to examine applicants as to their learning and qualifications and to admit to practice was exercised from that day by the judicial department of the English government, and no legislation sought to deprive the court of the power in that respect or to invest it in any other branch of the government. Parliament legislated upon the subject, but the legislation was of a character to exclude persons unfit to practice, who threatened the public welfare through ignorance or untrustworthiness. The statutes always recognized that the admission of attorneys was a matter essentially belonging to the courts and a matter of judicial discretion, and only sought to protect the public against improper persons. The first of these acts was the 4 Henry IV, c. 18, passed in 1403. The attorneys had increased to the number of two thousand, and the act, reciting that damages and mischiefs ensued from the great number of attorneys unlearned in the law, ordained and established that all attorneys should be examined by the justices, and by their discretion their names put in the roll and the other attorneys put out by the discretion of said justices, and their masters for whom they were attorneys should be warned to take others in their places, so that in the meantime no damage or prejudice should come to their said masters. (Maugham on Attorneys, app. 9.) In 1413, by 1 Henry V, under-sheriffs, sheriffs, clerks, receivers and bailiffs were

excluded from practicing as attorneys, because "the king's liege people dare not pursue or complain of the extortions and of the oppressions to them done by the officers of sheriffs." In 1455, by the 33 Henry VI, c. 7, parliament limited the number of attorneys for Suffolk, Norfolk and Norwich, reciting that the number had increased more than eighty, "most of whom, being not of sufficient knowledge, came to fairs, etc., inciting the people to suits for small trespasses." In 1606, by the 3 James I, c. 7, it was attempted to further regulate attorneys to the same end. (Maugham on Attorneys, app. 13.) Parliament did not, by any of these acts, undertake to determine the amount of learning which would qualify a person for admission. The courts, from time to time, made their rules regulating the admission of attorneys, and on occasion provided for the appointment of a committee or board of examiners. (Maugham on Attorneys, app. 14, 16.) Blackstone says (3 Com. 26): "These attorneys are now formed into a regular corps. They are admitted to the execution of their office by the superior courts of Westminster Hall. * * * No man can practice as an attorney in any of those courts but such as is admitted and sworn an attorney of that particular court. An attorney of the court of king's bench cannot practice in the court of common pleas, nor *vice versa.* * * * So early as the statute 4 Henry IV, c. 18, it was enacted that attorneys should be examined by the judges and none admitted but such as were virtuous, learned and sworn to do their duty."

It is argued that the power to admit is legislative, because the similar power to disbar was granted by an act of parliament. By the statute 3 Edward I, c. 28, it was provided that if any counsel should be guilty of deceit or collusion in the king's court he should be imprisoned for a year and a day, and thenceforth should not be heard to plead in that court for any man. (3 Blackstone's Com. 29; Weeks on Attorneys at Law, sec. 14.) This no more tends to show that the power is legislative

than the fact that the legislature provides punishment for stealing shows that the trial and conviction of a thief are a legislative proceeding. It is a function of the legislature to fix punishment for transgressions against the public, and disqualification for office or the deprivation of a license is not infrequently annexed to such punishment. Neither does it follow because this court has at different times mentioned the statute as authorizing a disbarment proceeding that such a proceeding is legislative, or that the legislature might either disbar an attorney or prescribe a conclusive rule of evidence against him. The legislature provides for the punishment of misdemeanors and that a person charged with such offense shall be tried by some court, but the trial in the court is a judicial proceeding, and whether he shall be found guilty or not is beyond the control of the legislature. This court has "an inherent right to see that the license is not.abused or perverted to a use not contemplated in the grant," (*People* v. *Goodrich*, 79 Ill. 148,) and courts, in the absence of a statute, have inherent and summary jurisdiction over attorneys practicing at their bars. *Moutray* v. *People*, 162 Ill. 194.

The other class of professional practitioners in England were those who gave counsel in legal matters and conducted causes in courts as advocates. They came to the bar through the inns of court. These were colleges in which students resided and pursued their studies from a very early date. Lawyers gathered about the court at Westminster and *hospitia curiæ* were established, which were occupied by the lawyers and contained schools of law. On the suppression of the Knights Templars the pope granted their estates to the Knights Hospitalers of St. John of Jerusalem, who leased the buildings in London to the students of the law. The place was called "The Temple," from its former occupants, and the societies of the inner temple and middle temple were formed. The buildings included the inner temple and the middle tem-

ple, and there were added Lincoln's Inn, on the site of a palace of an earl of Lincoln, and Gray's Inn, the former residence of the Lords Gray of Wilton. After the suppression of the Knights Hospitalers by Henry VIII the society held the temple buildings of the crown by lease, and in 1608 they were granted by letters patent of James I to the chancellor of the exchequer, (a judicial officer,) the recorder of London and the benchers and treasurers of the inner and middle temples, for "lodging, reception and education of the professors and students of the law." At these inns the students of law attended in great numbers and were instructed in the law and practice. From time to time rules were made for the government of these inns by the judges, or with their concurrence and the advice and consent of the king or queen and the benchers or societies themselves. (Dugdale's Orig. Jurid. 312, 316, 317, 320.) The societies submitted for ages to be governed by the rules so made, and in every instance their conduct was subject to the control of the judges as visitors. They were voluntary societies, to which *mandamus* would not lie, but the ancient and usual way of redress for any grievance was by appealing to the judges. (*Boorman's case*, Marsh. 177; *King* v. *Gray's Inn*, 1 Doug. 353; *King* v. *Benchers of Lincoln's Inn*, 4 B. & C. 855.) The origin of their power to call to the bar is lost in the past, but they acted substantially as a board of examiners, subject to the control of the judges as visitors, and their act was accepted by the courts. The time of study was reduced from longer periods to five years before any student could be called to the bar, unless he was a master of arts or a bachelor of laws of the University of Oxford, Cambridge or Dublin. In their case it might be diminished to two years. He was then called a barrister. In the old books they were styled "apprentices," as in the foregoing order of Edward I, and were not qualified to execute the full office of an advocate until they were of sixteen years' standing, (3 Blackstone's

Com. 27,) when they might be advanced to the degree of sergeant. The benchers of the inn, who governed the society, were elected from the barristers according to seniority. There is nothing in all this which tends to support the view that the admission of any class of the legal profession was ever regarded as a legislative act.

In this country the courts of the United States have always controlled the admission of attorneys. The first Congress recognized their power in that respect and they have always retained it. The Federal judges have always required attorneys to be admitted to their respective courts. Admission to the Supreme Court of the United States does not confer the right to practice in the district and circuit courts. In *Ex parte Secombe*, 19 How. 9, on application for *mandamus* to the judges of the Supreme Court of the territory of Minnesota to restore petitioner to his office as attorney, the court said: "And it has been well settled by the rules and practices of common law courts that it rests exclusively with the courts to determine who is qualified to become one of its officers as attorney and for what cause he ought to be removed, * * * and we are not aware of any case where a *mandamus* was issued to an inferior tribunal commanding it to reverse or annul its decision, where the decision, in its nature, was a judicial act and within the scope of its jurisdiction and discretion." In the case of *Ex parte Garland*, 4 Wall. 331, the court, holding the test oath for attorneys to be unconstitutional, explained the nature of the attorney's office as follows: "They are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. It has always been the general practice in this country to obtain this evidence by an examination of the parties. In this court the fact of the admission of such officers in the highest court of the States to which they respectively belong, for three years preceding their application, is regarded as sufficient evidence of the possession of the

requisite legal learning and the statement of counsel moving their admission sufficient evidence their private and professional character is fair. The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it for misconduct ascertained and declared by the judgment of the court, after opportunity to be heard has been afforded. (*Ex parte Heffron*, 7 How. (Miss.) 127; *Fletcher* v. *Dangerfield*, 20 Cal. 430.) Their admission or their exclusion is not the exercise of a mere ministerial power. It is the exercise of judicial power, and has been so held in numerous cases. It was so held by the court of appeals of New York in the matter of the application of Cooper for admission. (*Matter of Cooper*, 22 N.Y. 81.) 'Attorneys and counselors,' said that court, 'are not only officers of the court, but officers whose duties relate almost exclusively to proceedings of a judicial nature, and hence their appointment may, with propriety, be entrusted to the courts, and the latter, in performing this duty, may very justly be considered as engaged in the exercise of their appropriate judicial functions.'" In 3 Am. & Eng. Ency. of Law (2d ed. 287) it is said: "But the admission of an applicant to practice is a judicial act, and the attorney, when admitted, is an officer and member of the court. The legislature has no power, therefore, to provide that any person possessing certain qualifications must be admitted. It cannot assume judicial powers, and in every case the courts are vested with discretion as to whether any applicant is entitled to admission." In Wisconsin the statute commanded the court to admit as counselors such persons as were counselors of the State of Illinois. On the motion of a resident of Illinois for admission the power of the legislature to enact

such a statute was denied, on the ground that the court must be able to control its officers. (*In re Mosness*, 39 Wis. 509.) See, also, *Petition of Splane*, 123 Pa. St. 527. In the State courts the power of the legislature to prescribe the amount of learning upon which the court must admit to the practice of law has never been recognized, so far as counsel have discovered, with the single exception of *Matter of Cooper*, 22 N. Y. 67, quoted from by the Supreme Court of the United States in *Ex parte Garland, supra*. In that case the legislature enacted a statute admitting to practice on diploma of the Columbia College, and it was held that the act was valid.

Counsel for applicants in this case contend that the subject is legislative and not judicial in its character, and the act of admission is ministerial. Their chief reliance is that case of Cooper. The first question there considered by the court of appeals was whether the admission of attorneys was a judicial proceeding. The Supreme Court had denied admission and Cooper had appealed. It was suggested that the power of admitting attorneys was executive or administrative rather than judicial, and this objection, if well founded, would be fatal to the appeal. Upon a full consideration of that question it was held that the admission of attorneys was a judicial proceeding and the exercise of an appropriate judicial function. The appeal was entertained on that ground. The power being judicial in its nature, our constitution prohibits its exercise by the legislature. The court based its decision upon the ground that although the appointment of attorneys had usually been entrusted in that State to the courts and was judicial in its nature, yet it was not a necessary or inherent part of their judicial power, but was subject to legislative action and had been derived from statute. In that State the power to admit to practice was exercised before the revolution by the Governor. By the constitution of 1777 the appointment of attorneys was given to the courts, but the pro-

vision was dropped from the constitution of 1846, which provided: "Any male citizen of the age of twenty-one years, of good moral character and who possesses the requisite qualifications of learning and ability, shall be entitled to admission to practice in all the courts of this State." In view of the history of admission and this particular condition of affairs the act was sustained. The consequences have been greatly deplored by eminent men abundantly able to judge of the injustice to the public resulting from the rule then established, under which other special laws were passed.

This court has never acknowledged the power of the legislature to prescribe the amount of learning which shall qualify an attorney to practice in our courts. Section 3 of the same act to which the provision in question is an amendment, and which is the same as section 10 of the act of 1845, has always provided that "any person producing a license or other satisfactory voucher proving that he hath been regularly admitted an attorney at law in any court of record within the United States, and obtaining a certificate of good moral character, as required in the preceding section, may be licensed and permitted to practice as a counselor and attorney at law in any court in this State without an examination." Each State has its own rules, and in some States inferior courts of record are permitted to grant licenses and in others the requirements have always been below ours. The effect of enforcing such a statute would be to degrade the profession and fill its ranks with those not qualified by our rules. This court has refused to recognize that section as valid, and has required that the course of study in the other State shall be at least equal to that prescribed by our rules, or that the applicant should have been engaged in active practice under the license for a specified period. Again, the statute has always provided that the license may be obtained from some two justices of this court, while the rules have required that the mo-

tion shall be made to and granted by the court. Two justices are a minority, and not a court, and no motion to admit has been granted except by a majority of the court. In *Dahnke* v. *People*, 168 Ill. 102, we held that although it was the duty of the county board to erect and keep in repair a suitable court house, when the board has provided rooms they are under the control of the courts. We said (p. 109): "It rests with the judges of the courts to arrange among themselves how they will occupy the several court rooms thus provided for them by the county board. The county board has no right to dictate to the judges as to what particular room each judge shall occupy. To make the judges of our courts depend upon a legislative or political body for the rooms in which they shall hold their sessions, in the manner indicated in this record, would be to destroy the dignity and independence of the judiciary." The courts have an undoubted right to order and control their court rooms and to maintain their independence as a branch of the government. Each department of the government derives its power from the same source, and each is of equal dignity and independence under our constitution. In Wisconsin it was held that the judicial power extended to the selection of the court's own janitor, and in its separate and independent sphere of action the power could not be taken from the court and given to the legislative or executive department or any officer of either. *In re Janitor Supreme Court*, 35 Wis. 410.

None of the decisions of this court cited by counsel for applicants touch this question in any way. With the exception of two cases they are proceedings for the disbarment of attorneys, and the power of the legislature to protect the public against persons unfit to practice law, and to pass laws for that purpose, has never been denied. One of the remaining cases is *Robb* v. *Smith*, 3 Scam. 46, relating to the right of one not admitted by the court as an attorney to commence or prosecute a suit

for another, and is of the same class.　One case only is
an application for admission, and that is the case of the
late Myra Bradwell.　(*In re Bradwell*, 55 Ill. 535.)　There
the court spoke of the attorney holding his commission
from two members of the court; but the decision was the
decision of the court, and not of two justices.　The appli-
cation was considered and denied by the court, as such,
because the legislature had, in effect, prohibited her from
practicing law.　The court passed on her legal acquire-
ments and said it was satisfied with her learning and
ability.　The court did not concede the power of the
legislature to decide that question.　It was held that
the court should not admit any person or class of per-
sons not intended by the legislature to be admitted.　It
was said that if the legislature should choose to remove
the existing barrier the court would cheerfully issue li-
censes equally to men and women.　After an amendment
providing that no person should be refused a license on
account of sex a license was granted to her.　The legis-
lature did not undertake, by the amendment, to deprive
the court of passing upon her learning and fitness to
practice law.　That power belongs to the court by vir-
tue of its being a court of justice and one of the depart-
ments of State into which, under the constitution, the
power falls.　Without such power, by which the courts
can protect themselves against ignorance and want of
skill, they cannot properly administer justice.　The doc-
trine of that case is the same as of the others.　It was
competent for the legislature to remove the barrier and
to protect Mrs. Bradwell in her civil rights against dis-
crimination on account of sex.

In any consideration of the question it must not be
forgotten that restrictions upon the privilege of practic-
ing law are created only in the interest of the public wel-
fare, and neither for nor against the student.　No one who
has commenced preparation has any inchoate right on
account of that fact, but is bound to furnish the test of

fitness required when he asks to enter upon the practice. It is not contended by learned counsel for applicants that there is any right, either vested or inchoate, but it is claimed that the legislature may assume control over the subject because it falls within the police power. It may be readily admitted that such all-pervading power does, in some respects, reach the practice of the law and gives to the legislature some power concerning it. The legislature may enact police legislation for the protection of the public against things hurtful or threatening to their safety and welfare. So long as they do not infringe upon the powers properly belonging to the courts they may prescribe reasonable conditions which will exclude from the practice those persons through whom injurious consequences are likely to result to the inhabitants of the State. The proviso in this case bears upon its face no such object, but practically concedes the wisdom of a change in the rules and that such change is in the public interest, and attempts to give particular persons the privilege of admission based upon some fancied right accruing on account of the time when they commenced the study of the law. Parliament and the legislature have always required that persons to be admitted should have certain qualifications and fulfill certain requirements. They have properly excluded persons whom they deemed unfit, but, with the single exception above named in New York, have not forced the admission of any one. It would be strange, indeed, if the court can control its own court room, and even its own janitor, but that it is not within its power to inquire into the ability of the persons who assist in the administration of justice as its officers.

Counsel, however, say that the power is not one pertaining to courts, or else each circuit court would have a right to admit to practice. The circuit courts do have such power, even under the statute, as to attorneys residing in other States desiring to appear and try a cause in a court of this State. Section 12 of the act in ques-

tion provides for such foreign attorney being admitted to practice in the several courts of law and equity in this State upon the same terms as attorneys residing in this State are admitted in the other State. If an attorney of a sister State appears in one of our courts he procures no license in this court, but is admitted to the bar for that case by the court in which he appears, under the statute and on the principle of comity. The power, in such case, has always rested in the particular court and still rests there. The court where the case is pending grants leave *ex gratia* for the occasion. (*In re Mosness, supra.*) It may also be conceded that each court originally had the right to admit to practice at its own bar, but at a very early date a provision was made for a general license to be granted by this court, and the power to admit generally has never been exercised by the circuit courts. In the absence of such a provision the requirements might be different in the various courts of the State, and it was a legitimate provision to secure uniformity as well as to obviate the necessity of applying to each court where one might desire to practice. For eighty years the courts have recognized the exercise of that power by the Supreme Court, and the regulation in that respect has established the law for this State. The fact that circuit courts do not exercise the powers of this court does not establish the claim that such powers are not judicial.

The function of determining whether one who seeks to become an officer of the courts and to conduct causes therein is sufficiently acquainted with the rules established by the legislature and the courts governing the rights of parties and under which justice is administered pertains to the courts themselves. They must decide whether he has sufficient legal learning to enable him to apply those rules to varying conditions of fact and to bring the facts and law before the court so that a correct conclusion may be reached. The order of admission is the

judgment of the court that he possesses the requisite qual-
ifications, under such restrictions and limitations as may
be properly imposed by the legislature for the protection
and welfare of the public. The fact that the legislature
may prescribe the qualifications of doctors, plumbers,
horseshoers and persons following other professions or
callings not connected with the judicial system, and may
say what shall be evidence of such qualifications, can
have no influence on this question. A license to such
persons confers no right to put the judicial power in
motion or to participate in judicial proceedings. The
attorney is a necessary part of the judicial system, and
his vocation is not merely to find persons who are will-
ing to have lawsuits. He is the first one to sit in judg-
ment on every case, and whether the court shall be called
upon to act depends on his decision. It is our duty to
maintain the provision of the constitution that no person
or collection of persons, being one of the departments
of the government, shall exercise a power properly be-
longing to another, and if the legislature by inadvert-
ence, as in this case, assumes the exercise of a power
belonging to the judicial department, it should only be
necessary to call its attention to the restraint imposed
by the constitution.

Whatever may have been the propriety of the rule
admitting the holder of a diploma issued by a law school
to practice, in view of the law schools existing at its
adoption, the rule had become an alarming menace to the
administration of justice. The legislature of New York,
by the statute above referred to, only sought to admit
the graduates of a great university who had been exam-
ined by eminent lawyers, but under our rule persons were
admitted who had been only nominally in attendance for
the stipulated period of time upon schools of a very
different grade. There was no State supervision of law
schools, and any person who saw fit could organize a law
school, and by advertising that the diplomas admitted to

the bar could obtain students.   The language of the proviso, "any law school regularly organized under the laws of this State," is mere sound and means nothing.   Anything in the form of a law school is regular, so far as the laws of this State are concerned.   In view of the disastrous consequences to the profession and the public, the rule by which it was only a step from the diploma mill to the bar was changed, and, in an effort to discharge a duty to the public, the general standard of admission was raised.   That the change was a wise one and that it will tend to promote the public welfare is not denied by counsel for applicants, who desire to elevate the standard of the bar and assure us that they sympathize with us in our efforts in that direction.   It is conceded that when the rule was made, November 4, 1897, the court had full power to make it and to fix the standard of admission. It was a valid rule of the court acting within its unquestioned jurisdiction, and the question is whether the legislature could rightfully encroach upon a power belonging to the judicial department and set aside the rule. The constitution answers the question in the negative.

The motion to admit the applicants by virtue of their diplomas is denied.                    *Motion denied.*

Mr. JUSTICE PHILLIPS, dissenting:

The applicants hold diplomas from law schools, which are produced in open court, together with certificates of good moral character, and a motion is entered by an attorney of this court to admit them to practice.

Prior to November 4, 1897, under rule 47 of this court, then in force, the holder of a diploma from a recognized law school of this State was admitted to the bar on producing a certificate of good moral character and presenting such diploma.   On November 4, 1897, this court adopted new rules of practice, and by section 39 thereof this court appointed a State Board of Law Examiners, whose duties were defined and the subjects in which ap-

plicants for admission to the bar should be examined were prescribed. The rule also required satisfactory proof of preliminary general education, and that the applicant should furnish evidence that he had pursued a course of law studies for three years in a law school or office, and all applicants, other than the bearers of foreign licenses, were required to be examined by said board, and on its certificate of qualification admission to the bar and the issuance of a license were authorized. The petition of the applicants in this case shows that they had begun the study of the law under the rules in force prior to November 4, 1897, and expected to be admitted on compliance therewith. The rules adopted November 4, 1897, went into effect immediately on their adoption. By an act approved February 21, 1899, entitled "An act to amend section 1 of an act entitled 'An act to revise the law in relation to attorneys and counselors,' approved March 28, 1874, in force July 1, 1874," it was provided as follows:

"Section 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That section 1 of an act entitled 'An act to revise the law in relation to attorneys and counselors,' approved March 28, 1874, and in force July 1, 1874, be amended so as to read as follows:

" 'Sec. 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That no person shall be permitted to practice as an attorney or counselor at law, or to commence, conduct or defend any action, suit or plaint in which he is not a party concerned, in any court of record within this State, either by using or subscribing his own name or the name of any other person, without having previously obtained a license for that purpose from some two of the justices of the Supreme Court, which license shall constitute the person receiving the same an attorney and counselor at law, and shall authorize him to appear in all the courts within this State and there to practice as an attorney and counselor at law, according to the laws and customs thereof, for and

during his good behavior in said practice, and to demand and receive fees for any services which he may render as an attorney and counselor at law in this State. No person shall be refused a license under this act on account of sex, and every applicant for a license who shall comply with the rules of the Supreme Court in regard to admission to the bar in force at the time such applicant commenced the study of law, either in a law office or at a law school or college, shall be granted a license under this act, notwithstanding any subsequent changes in said rules: *Provided*, that to date of the 31st day of December, A. D. 1899, a diploma regularly issued by any law school regularly organized under the laws of this State, whose regular course of law studies is two years and requiring an actual attendance by the student of at least thirty-six weeks in each of such years, shall be received by the Supreme Court of this State, and a license of admittance to the bar shall thereupon be granted by the said court to the holder of such diploma; but every application for admission to the bar made on behalf of any person to whom any diploma, as aforesaid, has been awarded, must be made in term time, by motion of some attorney of the said court, supported by the usual proofs of good moral character, and the production in the said court of such diploma, or satisfactorily accounting by the applicant for its non-production; and in all cases when the diploma on which the application is based does not recite all the facts requisite to its reception, all such omitted facts must be shown by the affidavit of the applicant, or some officer of the law school, or by both.'

"Whereas an emergency exists, therefore this act shall take effect and be in force from and after its passage."

Under this act the applicants present their applications for admission to the bar, and objection is made by members of the bar who appear in behalf of bar associations and as *amici curiæ*, who urge that the act is unconstitutional; that as an attorney is an officer of the

court his admission is an act of *quasi* public character, to which any person may object; that the admission of an attorney is a judicial act and a part of the judicial power; that the legislature cannot constitutionally impair the judicial power, and the act of February 21, 1899, is an assumption of such power and is special legislation denying the equal protection of the law, and hence not binding on the court.

The legislation of this State with reference to the admission of attorneys is by the act of February 10, 1819, which was substantially re-enacted in 1833 and is to the same effect as that found in the Revised Statutes of 1845 and 1874. By that legislation a person is prohibited from practicing as an attorney in any court of record without having obtained a license from some two of the justices of the Supreme Court, and such license shall constitute him an attorney at law and authorize him to appear in all courts of record in Illinois to practice as an attorney for and during his good behavior. The statute authorizes the justices of the Supreme Court to strike the attorney's name from the roll for malconduct in office, and gives to the Supreme Court and circuit courts power to punish, in a summary way, any attorney who may be guilty of contempt. By this legislation no court but the Supreme Court could license an attorney nor could any other court disbar him. The power to license being withheld from the circuit court, which is a court of general jurisdiction, it cannot be said that the power to license is a purely judicial act.

The power conferred upon the Supreme Court to license, by the legislature, which assumed control over the whole subject of admissions to and dismissals from the bar, has been recognized and acted upon by this court from the earliest legislation on this subject in this State, and has been treated as the source of this court's power to act with reference to these subjects. In the case of *Robb* v. *Smith*, 3 Scam. 46, a motion was made by the ap-

pellant to dismiss the suit because the papers were not signed by the plaintiff himself or any attorney of the court, as required by section 1 of the acts of 1819 and 1833. This case came up in 1841, and it was held with reference to this motion: "This is a point upon which we have but little authority, and we need little other than the letter and spirit of these provisions. * * * While those salutary provisions remain upon the statute books, not as a restriction upon the citizen or suitor, but for his protection against the mistakes, the ignorance and unskillfulness of pretenders, we cannot allow an action to be commenced or prosecuted by an 'agent' who, as such, is expressly inhibited the privilege and denied the power. * * * This act was passed, we believe, in a spirit of liberality toward suitors, and for their protection against the practices of those who might seduce their confidence and induce them to trust the latter in the management of important interests, when suitors could not possibly ascertain the skill and qualifications of those in whom they confided, or their acquaintance with the most intricate, difficult and important of human sciences. The statute has further provided that, for malpractices, etc., the Supreme Court may strike the name of an attorney from the roll. Should he be enabled, under the character of agent, to resume the practice, the intent of the law would be defeated and all its provisions rendered null and void." By this opinion the power of the legislature with reference to the subject is recognized, and the principle on which its recognition is based is, that it is the exercise of the police power for the protection against mistakes, ignorance and unskillfulness by suitors, who cannot possibly inquire into the skill and qualifications, with reference to an intricate difficulty and important question of science, of those who alone may go into courts as their representatives.

The court discussed again the question of admission to the bar under the statutes of the State in the case of

*In re Bradwell*, 55 Ill. 535. In that case it was said (p. 537):
"He is an officer of the court, holding his commission in
this State from two of the members of this court, and
subject to be disbarred by this court for what our statute
calls 'malconduct in his office.' He is appointed to assist
in the administration of justice, is required to take an
oath of office and is privileged from arrest while attend-
ing courts. Our statute provides that no person shall be
permitted to practice as an attorney or counselor at law
without having previously obtained a license for that
purpose from two of the justices of the Supreme Court.
By the second section of the act it is provided that no
person shall be entitled to receive a license until he shall
have obtained a certificate from the court of some county
of his good moral character, and this is the only express
limitation upon the exercise of the power thus entrusted
to this court. In all other respects it is left to our dis-
cretion to establish the rules by which admission to this
office shall be determined. But this discretion is not an
arbitrary one, and must be exercised subject to at least
two limitations. One is, that the court should estab-
lish such terms of admission as will promote the proper
administration of justice; the second, that it should not
admit any persons or class of persons who are not in-
tended by the legislature to be admitted, even though
their exclusion is not expressly required by the statute.
The substance of the last limitation is simply that this
important trust reposed in us should be exercised in con-
formity with the designs of the power creating it. * * *
It is sufficient to say that in our opinion the other implied
limitation upon our power, to which we have above re-
ferred, must operate to prevent our admitting women to
the office of attorney at law. If we were to admit them
we should be exercising the authority conferred upon us
in a manner which we are fully satisfied was never con-
templated by the legislature. * * * In view of these
facts, we are certainly warranted in saying that when

the legislature gave to this court the power of granting licenses to practice law, it was with not the slightest expectation that this privilege would be extended equally to men and women." By this opinion it is expressly held that the power to license is delegated to the court by the legislature, and it was recognized that the legislature had the right to impose limitations to such extent as it might deem proper, and that it had the right to take away the power.

The power to license and the power to disbar are alike the subject of legislation in the statutes to which reference has been made, and in *Winkelman* v. *People*, 50 Ill. 449, it was held that the circuit court had no power to suspend an attorney at law from practice. In that case it was said (p. 451): "The subject of attorneys and counselors at law has been considered by the legislature, and no power over them for malconduct—and such was the import of the charge against appellant—has been confided to the circuit courts. No power has been given them to strike an attorney from the rolls for any cause. In the Supreme Court alone is that power reposed. * * * The legislature has conferred this power expressly upon this court. By the fourth section of the act respecting attorneys and counselors at law it is provided, among other things, that the justices of the Supreme Court, in open court, shall have power, at their discretion, to strike the name of any attorney or counselor at law from the roll, for malconduct in office. (Gross' Comp. 41.) And there is a propriety in this, as the appointment of attorneys and counselors is made by that court and the power of removal appropriately rests with the power to appoint. In some States they are appointed by the circuit courts, and, of course, removable by them for proper cause. We know of no power inherent in the circuit court to suspend from practice an attorney duly licensed by this court,—at least none so to suspend him as virtually to strike him from the roll. But it may be asked, has

the circuit court no power over an attorney who shall be guilty of malconduct, such as charged against the appellant? The answer is, such court possesses ample power in the premises. Altering the pleas of a court is not only an offense of a grave character, but, being done without the authority of the court in which the files are, is a contempt of that court, its usages and customs, and is punishable by fine and imprisonment. On the possession of this power can those courts safely repose."

In *People* v. *Palmer*, 61 Ill. 255, a proceeding was had in this court to strike the name of the respondent from the roll for malconduct in office. In making the rule absolute it was said (p. 256): "In a certain contingency the discharge of the duty required is painful and disagreeable, but as it is imposed by the statute we cannot shrink from its performance. * * * The statute provides that this court, at discretion, shall have power to strike the name of any attorney or counselor at law from the roll for malconduct in office. It further makes it the duty of the court, whenever it shall be made to appear that any attorney has neglected, upon demand and tender of reasonable fees, to pay over or deliver money or property to his client, to direct that the name of such attorney shall be stricken from the roll of attorneys of this court. * * * This court is responsible, to some extent, for the honesty and capacity of those who shall minister at the altars of justice. We must grant the license to practice, and in the proper case it is our duty to disbar."

In a similar case (*People ex rel.* v. *Goodrich*, 79 Ill. 148,) it was said (p. 153): "This court having power, by express law, to grant a license to practice law, has an inherent right to see that the license is not abused or perverted to a use not contemplated in the grant. * * * In view of our duty as imposed by the statute, and of the defendant's rights as guaranteed him by the constitution and the laws, we are unable to see why this court has not and should not have the power to purge itself of all unclean-

ness which may be found in its cloisters, and ridding it-
self of any nuisance which may desecrate them."

In *Moutray* v. *People ex rel.* 162 Ill. 194, a proceeding in
the nature of an information was instituted in the circuit
court of Richland county, asking that the respondents
be suspended from the practice of law in that court.
A motion was made by the respondents to quash the in-
formation because the malconduct was not charged to be
against the peace and dignity of the People of the State
of Illinois, which motion was overruled and an answer
was filed and the case tried before the court upon the
issues formed. The order of the circuit court was that
the respondents be suspended from the practice of their
profession in that circuit from the 30th day of November,
1895, to the 16th day of June, 1897. In passing on the
question presented by that record on appeal to this court
it was held (p. 196): "We think there was no error in
overruling the motion to quash. The statute (chap. 13,
sec. 6,) provides that the justices of this court shall have
power, at their discretion, to strike the name of any at-
torney or counselor at law from the roll for malconduct
in his office, and that any judge of a circuit court or of
the superior court of Cook county shall for like cause
have power to suspend   *   *   *   during such time as he
may deem proper, subject to the right to have such order
set aside by this court upon appeal. The statute does
not prescribe the mode in which either of these powers
shall be enforced. Rule 50 of this court provides that in
case an application shall be made to strike the name of
an attorney from the rolls there shall be filed an infor-
mation, signed by the Attorney General or some State's
attorney, and when the information shall be deemed suffi-
cient the court will enter a rule to show cause. It does
not appear that any similar or other rule of court having
reference to a proceeding for the suspension of an attor-
ney from practice is in force in either the Richland circuit
court or in the second judicial circuit. It is the manifest

intent of the statute that the proceeding to suspend from practice shall be summary, and it would seem any appropriate procedure may be adopted, provided the charges are stated with sufficient particularity and reasonable notice is given and opportunity afforded the respondent to produce his testimony and make his defense."

Subsequently an information was filed in this court in the case of *People ex rel.* v. *Moutray*, 166 Ill. 630, in which it was sought to have the name of the respondent stricken from the roll of attorneys, and it was held (p. 632): "This objection was held of no avail on the appeal of respondents in *Moutray* v. *People*, 162 Ill. 194. The statute authorizes us, in our discretion, to strike the name of any attorney from the roll for malconduct in his office. Such a proceeding is of a civil character, and not for the purpose of punishment. It is not a prosecution which must be carried on in the name of the People, and the provision of the constitution relied upon has no application. * * * It is our duty to guard and maintain the character of the profession, and to protect the courts and litigants against those who indulge in practices designed to corrupt and defeat the administration of justice."

In all of these opinions there is a recognition of the power to license as delegated to the court by the legislature, or a recognition of the right to disbar by reason of the power conferred by the legislature, and in none of the cases cited has the right to license or to disbar been placed upon any power inherent in the court, but has been recognized as conferred by the legislature. If either the power to license or the power to disbar is inherent, as belonging to a court of record as an attribute necessary for the performance of its judicial duties, and is solely and only a judicial act having its origin in the power of the court alone, it is difficult to see why a circuit court, being a court of general jurisdiction under the constitution of this State, must not possess the power to license or disbar as an inherent power equally with the

Supreme Court of this State; and with the many circuit courts of the State and with the numerous circuit judges there would be constant disagreements and constant conflict with reference to the admission to the bar and with reference to disbarments, and much confusion would result in the administration of justice by reason of the difficulty in determining who are and who are not officers of the court.

Both counsel for the applicants and counsel opposing the motion to admit the applicants and grant them licenses have evidenced great industry and ability in presenting the full history of the question of admission to the bar in England and in this country. But I have not deemed it necessary to enter upon a discussion of the history of this question, as full power is conferred by the statutes of the State, and the legislature has throughout its history, by its legislation, controlled the question of admission to the bar and disbarment, which has been recognized by this court. I concur in the view expressed by Justice Selden in *Cooper's case*, 22 N. Y. 90, where it is said: "The power of the court to appoint attorneys as a class of public officers was conferred originally, and has been from time to time regulated and controlled in England by statute." After reviewing the constitution, decisions and laws of New York State he says: "It is plain, therefore, that although the appointment of attorneys has usually been entrusted, in this State, to the courts, it has nevertheless, both here and in England, been uniformly treated, not as a necessary or inherent part of their judicial power, but as wholly subject to legislative action."

The control exercised by the legislature being the exercise of a police power with reference to the subject matter, cannot be held to be an impairment of judicial power nor the assumption of such judicial power by the legislature. The power of the legislature to prescribe qualifications for the office to which an applicant must

conform was incidentally before the Supreme Court of the United States in *Ex parte Garland*, 4 Wall. 333, where the statute in relation to the test oath was before the court, and it was held: "They are officers of the court, admitted as such by its order, upon evidence of their possessing sufficient legal learning and fair private character. It has always been the general practice in this country to obtain this evidence by an examination of the parties. In this court the fact of the admission of such officers in the highest court of the State to which they respectively belonged, for three years preceding their application, was regarded as sufficient evidence of the parties possessing the requisite legal learning, and the statement of counsel moving their admission is sufficient evidence that their private and professional character is fair. The order of admission is the judgment of the court that the parties possess the requisite qualifications as attorneys and counselors and are entitled to appear as such and conduct causes therein. From its entry the parties become officers of the court and are responsible to it for professional misconduct. They hold their office during good behavior, and can only be deprived of it by misconduct ascertained and declared by the judgment of the court, after opportunity to be heard has been afforded. * * * The attorney and counselor being by the solemn judicial act clothed with his office does not hold it as a matter of grace and favor. The right which it confers upon him to appear for suitors and to argue causes is something more than a mere indulgence, revocable at the will of the court or at the command of the legislature. It is a right of which he can only be deprived, in the judgment of the court, for immoral or professional misconduct. The legislature may undoubtedly prescribe qualifications for the office, to which he must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life. The question in this case is

not as to the power of courts to prescribe qualifications, but whether that power has been exercised as a means for the infliction of punishment, against the prohibition of the constitution."

The objection that the act under which this motion for admission is made is special legislation, and therefore violative of the provisions of the constitution, cannot be sustained. It was held in *Williams* v. *People*, 121 Ill. 84, (on p. 87): "It is the common exercise of legislative power to prescribe regulations for securing the admission of qualified persons to professions and callings demanding special skill, and nowhere is this undoubtedly valid exercise of the police power of the State more wise and salutary and more imperiously called for than in the case of the practice of medicine." The court there pointed out that exempting ten-year practitioners from the act, which required all others to have a diploma or pass a special examination, was not special legislation. It said: "It was in the province of the legislature to prescribe what should be the qualifications for the practice of medicine and what the mode in which they should be determined. The act provides as to a graduate in medicine with a diploma that he may practice upon his diploma, it being verified as pointed out by the act. In regard to others it is provided they shall undergo an examination before the State board or board of examiners and may practice upon the certificate of the board. As respects the proviso, we regard it in the light of but prescribing a qualification— that ten years' practice within the State should constitute a qualification for practicing medicine." See, also, *Atchison, Topeka and Sante Fe Railroad Co.* v. *Matthews*, 174 U. S. 96.

The act of February 21, 1899, is, in my opinion, constitutional.

Mr. JUSTICE BOGGS: I concur in the dissenting opinion of Mr. Justice PHILLIPS.