(No. M.R. 3972.—

*In re* EDWARD A. LOSS III, Petitioner.

*Opinion filed August 17, 1987.*

188

WARD, J., took no part.

RYAN, J., CLARK, C.J., and MORAN and MILLER, JJ., specially concurring.

SIMON, J., dissenting.

John A. Holtaway, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Haddad, of Chicago, for petitioner.

JUSTICE GOLDENHERSH delivered the opinion of the court:

On November 21, 1984, petitioner, Edward A. Loss III, submitted to the State Board of Law Examiners (Board) his application for admission to the bar of Illinois. An inquiry panel of the Committee on Character and Fitness voted to recommend that petitioner not be certified to the Board for admission to the bar. Pursuant to Rule 4.4 of the committee's rules of procedure, petitioner's application was referred to a hearing panel. After hearing testimony, the panel voted to certify to the Board that petitioner was fit to be admitted to the bar. Subsequently, the full committee considered and approved petitioner's application, and upon receipt of certification (87 Ill. 2d R. 708(d)), the Board recommended to the court that petitioner be admitted. In an order en-

tered on June 4, 1986, stating that "upon review of the extraordinary circumstances brought out at the hearing before the Character and Fitness Committee" it was unable to say that petitioner had satisfactorily established that he was of good moral character, the court granted petitioner leave to file a petition for admission addressing the question of character and fitness. The Administrator of the Attorney Registration and Disciplinary Commission was directed to file a response, and the parties have filed briefs and argued orally.

Petitioner contends that this court has delegated to the committee the authority to determine whether an applicant has established that he is of good character and fit for admission to the bar. He argues that our decisions have consistently held that the court will not reverse the committee's finding (*In re Ascher* (1980), 81 Ill. 2d 485; *In re Frank* (1920), 293 Ill. 263) unless there has been an abuse of discretion. He argues, too, that under Supreme Court Rule 708(c) (87 Ill. 2d R. 708(c)) certification by the committee entitles him to admission. Finally, he contends that to deny his admission to the bar would deny him due process.

The Administrator contends that the court has the inherent jurisdiction to review the recommendation of the committee and should deny petitioner's application for the reason that his record shows him to be unfit for admission to the bar of Illinois.

The record shows that petitioner was born in 1947 and that, from the early 1960's until approximately 1980, he was involved in juvenile delinquencies, criminal activity, and drug and alcohol addiction. While a student at high school, petitioner was suspended on approximately 23 occasions, and on his first job was discharged for stealing money from vending machines. He was charged with robbery and, as an alternative to conviction, was given an opportunity to enter military service.

He enlisted in the Marine Corps. While in the Marine Corps, he was absent without leave for a period of 71 days and ultimately was given an undesirable discharge. Petitioner was also arrested and convicted on charges of disorderly conduct (for stealing money), selling marijuana, and possession of heroin, cocaine and marijuana. The record is not clear as to the number of convictions. He used various aliases. In 1975, petitioner was arrested for possession of marijuana, selling heroin, and for theft from a gasoline station.

In December 1980, petitioner submitted an application for admission to the DePaul University College of Law. He appears to have been less than candid in his application and failed to reveal convictions for disorderly conduct and theft. The application contains other answers which appear to be less than accurate. In contrast to his application for admission to law school, his application for admission to the bar candidly reveals facts and details about his background, including arrests and convictions not previously noted. During his law school years he was an excellent student, started a business by means of which he supported his family, and aided and befriended many of his fellow students.

At the hearing, a United States district judge testified that for two semesters petitioner had worked with him in his extern program, that his work was excellent, and that he believed petitioner to be an individual of great integrity. He further testified that, knowing of petitioner's experience with drugs and alcohol, his arrests, and his undesirable discharge from the Marines, he believed petitioner to be of good character. Two professors at the law school attended by petitioner testified that he had been completely rehabilitated, and they believed him presently to be of good moral character. They recommended his admission to the bar. An employment counselor for the Safer Foundation testified in petitioner's

behalf. A number of petitioner's friends and fellow students testified in his behalf, and several of his classmates expressed gratitude for help petitioner had given them in courses with which they had difficulty at law school.

We consider first petitioner's contention that the court has delegated to the committee its power to determine whether an applicant is of good character and fit to practice law. Simply stated, it is petitioner's position that the court has provided by rule that the matter is to be determined by the committee and has further provided therein that, upon certification by the committee, an applicant is "entitled to admission" (87 Ill. 2d R. 708(c)) and that there is no provision in the rule for review by the court of a decision favorable to an applicant. He argues further that the rule has the force of law and that he had the right to rely upon the provision of the rule that upon certification by the committee he would be admitted.

This court is vested with the inherent power to regulate admission to the bar. (*In re Application of Day* (1899), 181 Ill. 73.) This power carries with it the concomitant duty to protect the public from dishonesty and incompetency on the part of members of the bar. (*People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346, 349-50.) The exercise of the power and the discharge of the duty require that the final judgment concerning admission of an applicant rest with this court. The determination by the committee concerning the character and fitness of the applicant, although entitled to weight, is advisory, and neither binds this court nor limits its authority to take action. *In re Mitan* (1979), 75 Ill. 2d 118.

Petitioner asks hypothetically, assuming that the court is to review the committee's findings, in what manner is it to obtain pertinent information. The short

answer is that the court may initiate such review, *sua sponte*, or upon the basis of information regardless of its source. It may inquire into events subsequent to the certification or require additional information concerning events which occurred prior to the hearing before the committee. Rule 708(a) provides that the members of the Board are *ex officio* members of the committee. Although the Historical and Practice Notes contain no explanation for the inclusion of this provision, it would appear that the court wished the Board to be aware of all proceedings before the committee in order that the court might be fully advised concerning those proceedings.

Petitioner argues, with justification, that a denial of admission without further procedures following certification would constitute a denial of due process. It should be noted that here, the court, *sua sponte*, provided an opportunity for petitioner to appear and persuade the court that the record before the committee did, indeed, support the conclusion that he had been fully rehabilitated and was fit to be admitted to the practice of law.

We turn to petitioner's contention that, absent arbitrary action by the committee, our prior decisions preclude review by this court. The court has not previously considered a standard of review of a finding that an applicant be certified; the cases reviewed have involved denials of certification. (See, *e.g.*, *In re Frank* (1920), 293 Ill. 263; *In re Latimer* (1957), 11 Ill. 2d 327; *In re Ascher* (1980), 81 Ill. 2d 485.) Review in those cases required that we respect the grant to the committee of discretion in certification (*In re Frank* (1920), 293 Ill. 263) and also protect an applicant's right to due process and to be free from arbitrary action by the committee. See *Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752.

Different concerns are present here, and a different standard of review applies. A review of a grant of certi-

194

fication involves the court's duty to protect the people of Illinois against incompetency and dishonesty on the part of members of the bar. (*People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346, 349-50.) "A license granted by this court to practice is a guaranty that, as far as this court is advised, the person holding such license is a fit person \*\*\*." (*In re Rosenberg* (1953), 413 Ill. 567, 576.) In order to provide such guaranty the court must determine that the record shows by clear and convincing evidence that petitioner has been rehabilitated and is fit to practice law. *In re Kuta* (1981), 86 Ill. 2d 154, 157.

We consider next petitioner's contention that under Supreme Court Rule 708(c), having been certified by the committee, he is entitled to admission to the bar. A rule, like a statute, must be construed to avoid an absurd or unconstitutional result. Were we to construe Rule 708(c) in the manner urged by petitioner we would face the absurd situation that, confronted with the record here, we were powerless to consider the correctness of the decision to certify and would be required to blindly admit petitioner. This does not comport with our duty to protect the People against incompetency and dishonesty on the part of members of the bar. (*People ex rel. Chicago Bar Association v. Goodman* (1937), 366 Ill. 346, 350.) In *In re Mitan* (1979), 75 Ill. 2d 118, the court held that the omission of information from an attorney's application for admission to the bar constituted fraudulent concealment of improper activities which warranted disbarment. If conduct prior to admission was held to be the basis for disbarment, there is no impediment to the exercise of this court's authority prior to admission. To read literally the language of the rule would divest this court of jurisdiction to review the finding of the committee and thereafter deny admission, resulting in an unconstitutional

delegation of our jurisdiction and an abdication of our duty to regulate the bar of this State.

We consider now petitioner's contention that he relied upon procedures outlined in our rules, that this reliance entitles him to admission, and that to deny him admission results in a fundamental unfairness. An applicant for admission to the bar has no vested interest in the continued existence of a rule of this court. (*Schlenz v. Castle* (1981), 84 Ill. 2d 196.) The rules of this court are under constant review and are frequently amended and revised. Petitioner, like all other litigants, is bound by this court's construction of the rule. Unfortunate language in the rule upon which petitioner relied will not serve to divest this court of jurisdiction to perform its constitutional duty. The procedure followed provided petitioner all of the due process which the situation required.

We consider next petitioner's assertion that he could not foresee the lengthy 18-month "roller coaster" process that his application generated and that the ensuing delay denied him fundamental fairness. The transcript shows that his record merited close scrutiny, and in view of petitioner's record, the hearing and the extensive testimony were necessary and proper. The review was essential to the protection of the integrity of the bar and the interests of the People of this State. In light of the circumstances, we cannot say that the time elapsed has been unduly lengthy. See, *e.g., In re Latimer* (1957), 11 Ill. 2d 327.

We consider now petitioner's contention that he is fully rehabilitated and fit for admission to the bar. The burden of proving good present moral character is on petitioner. (*In re Ascher* (1980), 81 Ill. 2d 485, 498.) Because of his prior record, petitioner also bears the burden imposed upon an applicant for reinstatement to the bar to show by clear and convincing evidence not only

that he is ready to " 'return' to a beneficial, constructive and trustworthy role" in society (*In re Wigoda* (1979), 77 Ill. 2d 154, 159), but also that his rehabilitation is such that he is a fit person to practice law.

Rehabilitation is the important factor in the court's evaluation of a petition for reinstatement (*In re Silvern* (1982), 92 Ill. 2d 188), and the same rationale applies here.

A member of the Illinois Board of Law Examiners has examined indicia of rehabilitation of character and fitness. (Duhl, *Character and Fitness—The Rehabilitation Factor*, The Bar Examiner, Feb. 1983, at 11.) The factors, based primarily on *Schware v. Board of Bar Examiners* (1957), 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752), are (1) community service and achievements, as well as the opinions of others regarding present character; (2) candor before the court; (3) the age of the applicant at the time of the offenses; (4) the amount of time which has passed since the last offense; (5) the nature of the offenses; and (6) the applicant's current mental state.

Petitioner has presented an impressive list of character witnesses, including former classmates, professors and employers who attest to his rehabilitation and present good moral character. He has presented evidence of his academic achievements, including his graduation with honors, his externships and clerkships, his participation on law review, and his tutoring of a handicapped law student. He notes that his last arrest occurred more than 11 years ago and asserts that he has overcome his drug and alcohol addiction. He points out that his arrests occurred during those years when he was addicted to drugs, and that most of his offenses were drug related.

Although the Administrator did not present evidence at the hearing before the committee, he has moved in

this court to supplement the record with newly discovered evidence. He argues that petitioner's testimony was inconsistent, lacking in candor, and revealed additional misrepresentations in his application for admission to the bar. He contends that the record requires denial of petitioner's application.

We need not lengthen this opinion by specific citations to the transcript, but we agree with the Administrator that the proceedings before the committee reflect inconsistencies in petitioner's testimony and belated recollection of matters omitted from his application for admission to the bar. We note further that the Administrator's motion for leave to supplement the record contains allegations which, if proved, may be relevant to the issues of rehabilitation and present good moral character and that a document filed by petitioner in this court shows that subsequent to the hearing before the committee petitioner's marriage was dissolved.

Upon consideration of the record in its entirety, we conclude that the evidence does not support the finding that petitioner is presently of good character and sufficiently rehabilitated to be admitted to the practice of law.

Notwithstanding the conclusion reached, we note that rehabilitation is a continuing process and the record reflects substantial improvement in petitioner's condition. We find apposite here our statement in *In re DeBartolo* (1986), 111 Ill. 2d 1, that petitioner's prior conduct need not "bar him for life from the practice of law. Just as an attorney who has been disbarred, disbarred upon consent, or suspended until further order of the court may, after passage of the applicable period of time, seek reinstatement (see 94 Ill. 2d R. 767), by analogy the petitioner here should be allowed to reapply for admission, and he may do so at this time. Upon the petitioner's reapplication, the committee may consider all matters that

are relevant to his moral character and general fitness to practice law, including his conduct since the hearing held here and his candor in filling out his new application and in responding to whatever inquiry the committee makes." 111 Ill. 2d 1, 6-7.

For the reasons stated, the petition for admission is denied.

*Petition denied.*

JUSTICE WARD took no part in the consideration or decision of this case.

JUSTICE RYAN, specially concurring:

I concur in the opinion of the court. However, certain comments contained in the dissenting opinion compel me to write this special concurrence. Also, as noted herein, I am not satisfied that there was a valid certification of Loss' good character and fitness to practice law.

The author of the dissenting opinion has, inadvertently I hope, used innuendos, general accusations, and emotionally charged language, which were seized upon by segments of the media, expanded and used to create a *cause celebre* over a "reformed drug addict and petty thief" whom this court has refused to license to practice law. I feel I must respond to the misleading and unfortunate statements by the author of the dissent, which have caused the media and the public to challenge the integrity of those who joined in the majority opinion. The language of the dissent which I find particularly objectionable states:

> "It [the order of June 4, 1986] failed to advise Loss of how this matter even came before us. *Nothing in the record indicates the source of the information which triggered this extraordinary proceeding.* Such review has not taken place—in even a single instance—since I have been a member of this court. Moreover, as the majority concedes, there are no formal procedures for keeping the

court apprised of an applicant's interaction with the Committee on Character and Fitness. (119 Ill. 2d at 192-93.) The only way this court could have been advised of Loss' situation, therefore, was *through an informal communication.* The possibility that this unusual proceeding was initiated on the basis of *rumors or gossip turns the entire admission process into a sham. It appears that those who can grab the court's ear and are displeased with an applicant can trigger an additional inquiry,* by this court itself, into the applicant's moral character. To adequately address the question of his good character and fitness Loss has a right to know how and why his application *was singled out for such special attention."* (Emphasis added.) 119 Ill. 2d at 220-21.

I find this language offensive because it implies that there was some clandestine, unethical, and possibly illegal communications from some unspecified person or persons to certain members of the court, which caused Loss' application for admission to the bar to be "singled out for such special attention." (119 Ill. 2d at 221.) The author of the dissent was given every bit of information that other members of the court were given. Why did he not then, in the dissent, specify that about which he was complaining? Why was it necessary to resort to such damaging innuendos and general accusations? Why was it necessary to invite the public to speculate as to what sinister activity had produced this result and the media to publicly imply that the "fix is in" on the court?

In an attempt to clarify the murky innuendos of the dissent, I set forth herein the facts as they occurred. If the following constituted "informal communication," or "rumors or gossip," or grabbing "the court's ear," why did the author of the dissent not complain about it in the conference room, when the matters to which he now apparently alludes were openly discussed? Unfortunately, this recitation must, of necessity, be lengthy.

The large number of applicants for admission to the bar from the First Judicial District (Cook County) made it difficult for the Committee on Character and Fitness of that district to timely process the applications. For this reason, the procedures for processing the applications were changed in the First District. Our Rule 709(a) (107 Ill. 2d R. 709(a)) provides that the State Board of Law Examiners and the Committee on Character and Fitness may adopt rules for the proper performance of their respective functions. The changed rules of procedure for the Committee on Character and Fitness in the First Judicial District provide that the questionnaire, which is answered and submitted by the applicant for admission, will be reviewed by an examiner. (Rules of Procedure of the Committee on Character and Fitness for the First Judicial District, Rule 3 (hereinafter cited as Rules of Procedure).) If adverse matters bearing on the applicant's character appear on the questionnaire, the examiner may refer it to an inquiry panel of three members. (Rules of Procedure, Rule 4.1.) The inquiry panel may certify the applicant only upon a unanimous vote. (Rules of Procedure, Rule 4.3.) If the inquiry panel does not certify the applicant, a hearing panel is then impaneled. (Rules of Procedure, Rule 4.4.) The hearing panel consists of seven members. Four members are necessary to constitute a quorum. (Rules of Procedure, Rule 5.1.) The secretary is then required to notify the applicant of a hearing date and the matters adverse to the applicant, as specified by the inquiry panel. (Rules of Procedure, Rule 5.2.) Following the hearing, the applicant may be certified only upon receiving at least four affirmative votes of the hearing panel. (Rules of Procedure, Rule 5.4(b).) If the hearing panel votes to certify an applicant, the secretary shall notify the applicant. Rules of Procedure, Rule 6.1.

Edward A. Loss was the first person whose application was processed through the inquiry panel, on whom a hearing was held by the hearing panel, under the new rules. Following the hearing, the hearing panel notified the secretary that Loss had been certified by the panel. The secretary notified the State Board of Law Examiners and Loss of the certification on February 17, 1986. The court was notified of this certification of the hearing panel, and the matter was discussed by the court in the conference room. Following this discussion, the court informed the State Board of Law Examiners that our Rule 708(c) (107 Ill. 2d R. 708(c)) requires certification by the entire Committee on Character and Fitness, and not certification by only a majority of a seven-member hearing panel. The State Board of Law Examiners was further informed that the certification by the hearing panel did not comply with our rules. The State Board of Law Examiners then returned the certification to the Committee on Character and Fitness and requested the full committee to consider the application. A special meeting of the committee was held on April 14, 1986, but voting on the question of certification was not completed until April 29, 1986. The report from the secretary of the Committee on Character and Fitness and the report from the State Board of Law Examiners do not show that any meeting of the committee was held other than on April 14, 1986. A statement that "voting by the full committee was completed on April 29, 1986," indicates that voting by some members of the committee was other than at the special meeting held on April 14, and must have been by telephone, by letter, or at least by some means other than at the meeting. The full membership of the committee as of April 14, 1986, was 27, pursuant to an order of this court entered in June 1985. The vote of the full committee as reported to this court was 14 in favor of certification and 13 against. Thus, it appears that all

members cast their vote on the question in some manner.

The new rules of procedure for the Committee on Character and Fitness for the First District, which, as noted, were used for the first time in Loss' case, were deficient in that they contained no provision for a certification of an applicant by the full Committee on Character and Fitness as required by our Rule 708(c) (107 Ill. 2d R. 708(c)). The committee rules contain no provisions governing voting by the full committee on certification, or what constitutes a quorum, or the vote necessary to authorize certification by the full committee. Rule 5.4 provides that the hearing panel may, by unanimous vote of the members present at a meeting, adopt a resolution to vote by mail or telephone on an application. There is no such provision in the rules of the committee authorizing voting by the full committee by mail or telephone, or in any manner other than the customary method of voting at a duly called meeting attended by a quorum.

Thus, it appears to me that the attempted certification by the full committee reported to the court by the secretary of the State Board of Law Examiners on April 29, 1986, was also not a valid certification. Thus, all of the discussion in the dissent about not following our own Rule 708(c), which provides that after certification *by the committee* the application shall be entitled to admission, is irrelevant, as is the dissent's implication that we have violated Loss' due process rights by failing to admit him to the practice of law. Admittedly, the committee rules are deficient and must be amended. However, Loss has suffered no constitutional deprivation by virtue of the deficiency in the rules of the committee, because he was afforded a full hearing before the hearing panel (though not before the committee), and the order entered by this court on June 4, 1986, provided him an opportunity to brief and argue the case before this court, based on the

record that had been made before the hearing panel. The dissent complains that our June 4, 1986, order did not specify the issues that would be heard before our court. There was no need to do so. Loss had already been notified of the matters adverse to him, as specified by the inquiry panel (Rules of Procedures, Rule 5.2(b)) prior to the hearing before the hearing panel.

The majority opinion does not address the analysis that I have made herein and does not base its decision upon the fact that there had been no valid certification of Loss' fitness to practice law. I fully concur with the rationale of the majority opinion and with its holding. However, I submit this additional analysis, which supports the decision in this case. It further demonstrates that the very complicated factual question relating to the applicant's character and fitness, the confused procedural matters and the closeness of the questionable vote of the full Committee on Character and Fitness (14 for certification; 13 against) fully warranted this court's order of June 4, 1986, requesting the applicant to present and argue his case to the full court.

In his brief filed in this court, Loss complains that he had no notice or opportunity to appear before the full Committee on Character and Fitness. He argues that the committee violated its own rules by taking his matter under consideration. This argument, of course, supports my conclusion that the irregular proceeding before the Committee on Character and Fitness justified this court in entering its order of June 4, 1986.

Was the procedural information communicated to the court by "informal communications," "gossip or rumors," or as one member of the media stated, by putting the fix in on the court? Of course not. Those are absurd characterizations. This court has designated one of its members as liaison to each of its standing committees. Procedural questions and questions of policy are of-

ten communicated to the court by its committees through its liaison member of the court. The court's responses are, in turn, given to the committee through the same channel. That was the method used for communicating with the State Board of Law Examiners and the Committee on Character and Fitness concerning the procedural questions which arose in the Loss case by virtue of the new rules of procedure for the First District. When certification was made to the State Board of Law Examiners by the hearing panel, this information was communicated by the Board to the court. After discussing the matter, the court concluded that our rules require certification by the full committee, and the Board was so informed. Naturally, there was concern about the correctness of the procedure, since, as noted, this was the first case to arise under the new rules and since this was an unusual case.

Proceedings for the admission of attorneys to the bar are not the customary adversary proceedings which are litigated in courts. The majority opinion addressed this briefly. I again wish to state that the inherent power to regulate the legal profession is vested in this court. As long as due process considerations are honored in proceedings to admit applicants, this court is not limited in its sources of information. In this case, for instance, if we were prohibited from communicating with our State Board of Law Examiners or our Committee on Character and Fitness other than by receiving a certification of fitness upon filing, how would this court have been alerted to the closeness of the vote of the full committee, the possible irregularities in the proceedings, or even the desirability of reviewing the unusual facts of this case? Since there is no opposing party to the applicant in such proceedings, there is no adversarial way to call these matters to the court's attention other than through such reports as were received in this case.

As to the substantive information concerning Loss' moral character and fitness to practice law, the court received that from the transcript of the hearing before the hearing panel. Our Rule 709(b) (107 Ill. 2d R. 709(b)) provides that all testimony taken at such hearings shall be transcribed and transmitted to the court, if requested.

Loss seems to argue that the three-member inquiry panel found in his favor. It did not. It refused to certify him and referred his application to the full committee for a hearing "because of the importance and complexity of the issues his case raises." The inquiry panel could have voted to certify Loss, in which event there would have been no hearing before the hearing panel. (Rules of Procedure, Rules 4.3, 4.4.) It did not vote in favor of his certification. Instead, it referred the matter to the committee for hearing.

The dissent asserts that pursuant to our Rule 708(c) (107 Ill. 2d R. 708(c)), if the Committee on Character and Fitness certifies an applicant, he is *entitled to be admitted to the practice of law* and that such certification is binding on the court. Assuming there was a valid certification by the committee, the majority opinion of this court correctly points out that such a literal reading of this rule would result in an abdication of our duty to regulate the bar of this State. This rule cannot be read as conferring an absolute entitlement to admission, as urged by the dissent and by Loss. For example, nothing in Rule 708(c) requires that the applicant successfully complete his bar examination, or be authorized admission on a foreign license, or be over 21 years of age. Under a literal reading of Rule 708(c), which the dissent urges, all that is required for admission to the bar is certification by the Committee on Character and Fitness.

That, of course, is not correct. All that an applicant is entitled to, upon being approved by the committee, is a certification by the committee to the *State Board of Law*

*Examiners* (not the court) that he is of good moral character and general fitness to practice law. Our Rule 704(g) and Rule 705(e) (107 Ill. 2d Rules 704(g), 705(e)) provide that if the State Board of Law Examiners shall find that the applicant meets the requirements of our rules (bar examination or foreign license) and has received from the Committee on Character and Fitness certification of good moral character and fitness to practice law, then "the Board shall certify to the court that such applicant is qualified for admission." The Committee on Character and Fitness does not make its certification to the court, but to the State Board of Law Examiners. There is nothing in our Rule 704(g) or Rule 705(e) that says that if the applicant passes the bar examination or meets the admission on foreign license requirements and is certified by the Committee on Character and Fitness, the applicant is *entitled* to admission to the bar. All these rules provide is that in such event, the Board shall certify to the court that the "applicant is qualified for admission." The literal reading of Rule 708(c) is not consistent with the provisions of Rule 704(g) and Rule 705(e).

Furthermore, Rule 701(a) (107 Ill. 2d R. 701(a)) provides that persons *may* be admitted to the practice of law in this State if they are 21 years of age, of good moral character and general fitness, and have satisfactorily completed an examination on academic qualifications, or have met the admission-on-foreign-license requirements.

Thus, Rule 708(c) must be read in conjunction with the other rules governing the admission to practice law. In that event, the correct construction of Rule 708(c) is that if the committee is of the opinion that the applicant is of good moral character and general fitness to practice law, it shall so certify to the State Board of Law Examiners *and the applicant shall thereafter be entitled*

*to be certified to the court as qualified for admission pursuant to Rule 704(g) or Rule 705(e).*

It is also argued that only in the event of the refusal of the committee to certify an applicant may this court review the finding of the Committee on Character and Fitness. This is an erroneous assumption. It is true that there are no provisions in our rules specifically providing for such a review when a certification has been made as to an applicant. However, as noted earlier, our Rule 709(b) provides that a transcript of the hearing before the committee shall be transmitted to the court, if requested. Such a transmittal, of course, is to permit the court to review the evidence that has been presented at the hearing. If the court has no authority to review the findings of the committee upon certification, there would be no need for the court to review the evidence. The rule does not limit the transmittal of the transcript only to cases in which the committee refuses certification. Therefore, we must construe this rule as providing that the court may review the evidence presented before the Committee on Character and Fitness even though there has been a certification as to the qualification of the applicant.

It is true that, at least during my tenure, this court has never had the occasion to review the decisions of the Committee on Character and Fitness when it has certified an applicant. This does not mean, however, that under our rules we do not have that authority. Simply because we have never reversed such a certification does not mean that we may not do so. As stated in the majority opinion, and contrary to Loss' assertion, this court has not violated its own rule. We have never had the occasion before this case to say whether or not such authority exists under our rules, or whether the finding of the Committee on Character and Fitness is binding on the court.

The language relied upon stating that the discretion of the Committee on Character and Fitness will not be reversed unless certification has been arbitrarily *refused* was taken from cases in which there had been a refusal of certification and the question before the court was whether the refusal was arbitrary. (*In re Ascher* (1980), 81 Ill. 2d 485, 498; *In re Latimer* (1957), 11 Ill. 2d 327, 330; *In re Frank* (1920), 293 Ill. 263, 264.) This language cannot be construed to mean that the court may not review the decision of the committee when there has been a certification.

The construction we place on our rules in this opinion is not contrary to any prior holding of this court, and if Loss would have construed the language of Rule 708(c) in connection with the other rules relating to this subject, instead of focusing on one phrase of Rule 708(c) (shall thereafter be entitled to admission to the bar), he could not have reasonably concluded that he was entitled to admission to the bar simply by certification by the Committee on Character and Fitness. In view of this, I see no due process deprivation in this case.

The majority opinion does not go into great detail in describing Loss' history of errant conduct. The conclusion of the case is that Loss is not forever precluded from admission to the bar in this State. In fact, the opinion invites him to reapply. Since Loss may someday be admitted to the bar in this State, it was thought inappropriate to unnecessarily besmirch his character by a detailed recitation of his past conduct. However, the dissent seems to depict Loss as a reformed individual, whose last arrest and errant act occurred in 1975, and segments of the media, in reporting Loss' cause, have referred to him as a reformed drug addict and petty thief. I therefore find it necessary to detail the depths of his prior degradation and, more importantly, to examine his recent conduct, which has manifested to me that he

has not rid himself of his prior traits of lying, deceit, deception and fraud to the extent that I would be willing to say to the people of this State that Loss is of sufficiently good moral character to practice law and to represent them in handling their most confidential, personal and valued affairs. I realize that this is a judgment call and others may not agree with my conclusion. This, however, is one of the duties that I am called upon to perform as a member of this court. After considering the evidence, my conclusion is as stated in the majority opinion.

Loss, by his own admission, to speak with charity, has had a very unsavory past. In the 1960's he was suspended from York High School at least 23 times and eventually dropped out of that school. He received his high school diploma from another school. In April 1966, Loss was arrested for committing a robbery in Maywood. The court gave him the choice of going to jail or joining the military. Loss enlisted in the Marine Corps. While in the Marines, he was absent without leave for 71 days and, while absent, he assumed the name of Edward Ashe and obtained a social security number in that name. Loss eventually turned himself in to the Marines and told his commanding officer that he was a homosexual. He stated in his testimony before the hearing panel that this was a lie and that he lied because it was the quickest way to get out of the Marine Corps. He was given an undesirable discharge, and at the time of his discharge, he was awaiting a court-martial.

While in the Marines, he began the use of drugs which, following his discharge, led to hard-drug addiction and dependency. In his own words, "I became a bad person. I became the type of a person who would steal from my friends. I exploited every friendship I had."

He spent the next four years in various colleges in the Chicago area, and graduated in December 1973. The

record shows that while in college, he supported himself and his drug habit by selling drugs and by the time he graduated he was addicted to heroin. He stated in his testimony that he did not report the profits from his drug sales on his income tax return. In February 1971, he was convicted of disorderly conduct and placed on one year's supervision. Also in 1971, he was discharged from a job as a pizza delivery man for stealing money.

In March 1973, Loss was arrested for possession of heroin, cocaine and marijuana. In 1974, he was arrested in San Diego for possession of heroin. At that time he was using the name of Antonio J. Harris. He had a driver's license and other false identification papers under that name. That charge was disposed of through a plea of guilty to disorderly conduct. Also in 1974, he was arrested in Las Vegas for possession of 17 pounds of marijuana. He had obtained the marijuana in San Diego and was on his way to Illinois to sell it. The charge was subsequently dismissed. In the fall of 1974, Loss was arrested in Oak Park for possession of two pounds of marijuana. He ultimately pleaded guilty to the charge and was placed on supervision. On April 14, 1975, he was arrested in West Chicago for selling heroin. This charge was later dismissed. In the summer of 1975, he was arrested for issuing a check drawn on an account which had insufficient funds and was issued to the Sears store in Oak Brook, Illinois. He pleaded guilty to misdemeanor theft and was fined. He has never made restitution to Sears for the amount of that check. In the summer of 1975, he was also arrested for stealing $300 through the issuance of a check to the Clark Oil Company gasoline station in Bartlett, Illinois. This charge was dismissed when the defendant pleaded guilty to possession of marijuana. He has never made restitution to the Clark Oil Company. In the winter of 1975, Loss was arrested in Schaumburg on a forgery charge. He had written a

check in the amount of $57 to the Sears store in the Woodfield shopping center, and the account on which the check was drawn had insufficient funds. The check was written on an account in the name of Ronald J. Renzoni, which was the alias that Loss was using at that time. He had purchased false identification papers showing that name. He did not make restitution to Sears.

Loss testified that at the end of 1975, he went to Columbia, Missouri. As he stated, he left "to get away from a very, very bad situation. I was just, as we used to say in the streets, I was very, very hot ***." In the winter of 1975, he was arrested in Columbia, Missouri, on a charge of aggravated assault. He was drunk and had threatened a clerk at a convenience store with a knife. At the time of his arrest, he was living under the name of Edward Casper LaVito. Also while in Columbia, Missouri, he began drinking alcohol excessively.

In late 1975, Loss moved to Colorado, where he worked at odd jobs. In August 1977, he began working for Yankee Creek Gun Works in Evergreen, Colorado. While working there, he assumed the name of F. Ralph Murdock. While working for this organization he worked himself up to chief operating officer. Also, while in this employment, he rid himself of his drug addiction. It was during this period, he contends, he began to reform.

He had previously been married and divorced three times, and while in Colorado he contacted a former girlfriend in Chicago. She came to Colorado and they were married. He entered a hospital in Denver for alcoholism treatment in 1979, and in early summer of 1980, he returned to Chicago and surrendered to authorities on a pending criminal charge.

In December of 1980, Loss submitted an application for admission to the DePaul University College of Law. One of the questions required that he list convictions of any crimes. He listed only his conviction of his 1973 Oak

Park possession of marijuana charge. He failed to reveal other convictions or to refer to his other arrests.

Also on the DePaul application, he was required to state whether he had ever been discharged from any employment for conduct reflecting on his character. He answered "no." His answer was false, because he had been fired from jobs in 1964 and in 1971 for stealing money and merchandise from employers.

Another question on the DePaul application asked if he had been employed during the academic year as an undergraduate. He stated that he had worked 40-plus hours per week as a landscaper and tree surgeon. That was an untruth. He was not a landscaper and had not worked in that capacity while in college. Instead, during college his principal employment was that of a drug dealer. In listing his last three positions of full-time employment on the application, he stated that he began working for Yankee Creek Gun Works, Inc., on January 20, 1974. This also was not true. He did not begin working for that organization until August of 1977. The questionnaire also asked the applicant to list the periods of time, of a greater duration than four months, when he was not employed or in attendance at an educational institution. He answered "none." This answer was false.

Not only did Loss lie in answering the questions, but he also embellished these falsehoods by attaching a letter to the application for admission in which he stated, "I might add that I did all the aforementioned, got good grades and worked no less than forty hours per week." He did not work 40 hours per week during the period of time referred to. He then was engaged in the occupation of selling drugs. Also in the letter, he stated he traveled around the United States for six months or so and then joined the Yankee Creek Gun Works, Inc., in 1974, which, as noted earlier, was false. He did not mention the impressive list of arrests on drug charges, forgery,

theft and aggravated assault which he compiled during that period. Loss testified that these false statements on the application for admission to law school were deliberate lies because he wanted to present himself in the best light possible in order to get into law school.

In the spring of 1981, Loss filed his 1980 Federal and Colorado income tax returns and signed them in the name of F. Ralph Murdock, and he used the social security number that he had obtained for Murdock on the returns. At the hearing before the hearing panel, he stated that he had filed his 1981 and 1982 income tax returns under the name of Edward Loss. Although he was requested to produce copies of those returns, he had not done so at the time of the hearing before the hearing panel, and he had not done so by August 7, 1986, the date that the brief of the Attorney Registration and Disciplinary Commission was filed in this court.

In June of 1981, Loss applied for a student loan at the First National Bank of Chicago. On the loan application he stated that his current employer was Home Environmental Services. This statement was false. He was not employed by that organization. This was an organization owned by his brother. He testified that he was not working for his brother at that time and the reason for that lie was to get a student loan.

Loss drank heavily while he was in law school, and in December of 1984, he voluntarily hospitalized himself for about a week because of his drinking problem. He contends that he has conquered this habit except for an occasional slip.

The statement in the majority opinion that Loss was less than candid on his application for law school, and that the application contained answers that were less than accurate, was simply a kind way of stating that Loss was an outright liar. He admitted at the hearing before the hearing panel that he lied in order to put him-

self in the best light possible so that he would be admitted to law school. I am not concerned about Loss' past history of drug and alcohol abuse. He claims that he has overcome those habits, which is to his credit, and he is to be commended. I am also not concerned about his past criminal activities. These, as was his drug habit, may well have been the product of a misspent youth.

What I am concerned about is Loss' propensity for lying. He lied whenever it was necessary to do so to achieve a desired end. He has demonstrated no commitment to the truth. To him, lying was simply a matter of convenience. He lied to the Marine Corps because it was the quickest way to acquire a discharge. He lied about his identity when his convenience required it, using at least nine aliases over a period of 14 or 15 years. His application for admission to DePaul Law School was an outrageous series of lies, which he admitted was for the purpose of gaining admission. He lied on his application for a student loan for the sole purpose of obtaining the loan. This propensity to lie was not manifested only during his errant youthful years. The Marine Corps episode occurred when he was 19 or 20 years old. He used different aliases until 1980, when he was about 33 years old. He was about 34 years old when he lied on his law school application, and on his application for a student loan. These lies with regard to his law school application and the loan application occurred after he claims he had turned his life around.

He has thus presented to us a history of about 15 years of lies and deceit. He now contends, however, on his application to the Committee on Character and Fitness, that he has been completely truthful in revealing his sordid past. Even if that is the case, and I will discuss that later, we must consider whether we should permit a person to perpetrate a fraud on a law school in order to be admitted, and then later, when applying for

admission to the bar, to admit that he had been a liar and be forgiven.

To me, being truthful in answering the Committee on Character and Fitness questionnaire is not a manifestation of the reform of a deceitful person. There was an obvious reason, not related to reform, for not lying on the application for admission to the bar, which was not present when applying for admission to law school. This court has held that making material false statements on a bar application is grounds for imposing sanctions. (*In re Mitan* (1979), 75 Ill. 2d 118.) In fact, in *Mitan*, we noted that recent cases from other jurisdictions recommend disbarment for such conduct. (75 Ill. 2d 118, 127.) Thus, the incentive for being truthful in answering the questionnaire for admission to the bar was to avoid disciplinary action against him at some future date, when these misrepresentations may have come to light. We should not encourage such deceit perpetrated upon our law schools by admitting those who brazenly lie on their applications for admission to such schools, absent a strong showing of rehabilitation. I do not consider that truthfully answering questions on the bar application, in view of the consequences of answering them falsely, to be very strong evidence that a liar has reformed.

Addressing now Loss' answers to the application for admission to the bar, we note that even there he was not as candid as he professes to have been. One question asked if he had ever been dropped, suspended, placed on probation, disciplined or expelled from any school, college, law school or other similar institution, or if he had been accused of any dishonesty in connection therewith. Loss answered "no." Nothing was said by him about his 23 suspensions from York High School. Also, he did not list or give information concerning his employment by several employers. These answers do not constitute material misrepresentation so as to warrant his discipline

after being admitted to practice, but they do reflect the continued existence of his inability to be truthful.

The dissent makes light of the reference in the majority opinion to Loss' recent divorce and asks how that fact is relevant to his fitness to practice law. This fact must be considered in connection with the fact that Loss had been married and divorced three times previously. At the hearing before the hearing panel, a witness testifying on behalf of Loss who professed to have some experience and knowledge in the area of social rehabilitation, stressed as an example of Loss' rehabilitation the satisfactory relationship between Loss and his wife and family. In the written brief and argument submitted to the hearing panel by his attorney, Loss' "stable family life" is noted as an indication of his rehabilitation. The divorce referred to in the majority opinion indicates the stable family life has fallen apart and this factor, which was held up as an indicia of rehabilitation before the hearing panel, has vanished. This is its relevance.

The dissent also construes the letter Loss wrote to the court, after the entry of our order of June 4, 1986, in which we decided to hear oral arguments on his application, as not being misleading. In that letter, Loss stated that absent the allowance by the court to him of costs and fees or *pro bono* intervention, "I am *unable* to continue to prosecute this case." (Emphasis added.) Although this may not be characterized as a claim of indigency, and may not, *per se*, be proof of an intent to defraud the court, it was a representation to this court that without outside help, Loss was financially *unable* to participate in the court proceedings. Based upon this representation, this court authorized the payment of Loss' attorney fees. However, an application for a mortgage loan signed May 15, 1986, about three weeks before Loss' letter to this court, as noted in the dissenting opinion, showed that he had a net worth at that time of

at least $125,000. (There is some question about the correctness of the compilation of the net worth on the form which shows $209,000 in assets, and $13,000 in liabilities. It appears that the liabilities may have been $84,000.) Also, verifications of employment submitted to the mortgage company at that time show that Loss' income for the year of 1985 was $51,200, and that his wife's was $20,311, and beginning July 1, 1986, she would be paid $28,000 per year. Under these circumstances, I view Loss' representation that he was financially *unable* to continue this litigation to be inaccurate and manifests to me that some of his prior traits remain.

The fact that Loss has conquered his drug and alcohol dependency, that he had a good record in law school, and that he has helped ex-convicts and drug addicts rehabilitate are all admirable accomplishments. However, in view of his past propensity to lie, in determining his fitness to practice law we are faced with considerations beyond these accomplishments. As stated by one member of the hearing panel when questioning Loss about his past record: "Why could the inference not be drawn that faced with unfavorable reality, you would also lie to a client or court?"

I am not satisfied in my own mind that Loss, who, over a period of 15 years, lived a life of lies and deceit, should be permitted to practice law. Under the circumstances of this case, I am not prepared to say that the record shows that he has divested himself of his past undesirable traits. I cannot, in good conscience, say to the people of this State that Edward A. Loss will be a lawyer who will deal with you and the public honestly, and in whom you can put your trust. Others may disagree. That is their prerogative.

It is difficult to understand public reaction. As a result of the ongoing Federal investigation into corruption in the circuit court of Cook County, the media and

the public have soundly condemned the legal profession for harboring too many crooks and cheats. Yet, when a majority of this court attempts to keep a person, whom it thinks will not ethically perform, from becoming a lawyer, the public permits itself to be manipulated into reading sinister motives into our action. Led on by irresponsible statements by segments of the media, members of the public have, in communications to this court, expressed outrage and charged that there has been an outright "fix." Such charges have even been directed at a member of the court who did not participate in this decision. The same irresponsible segments of the media and the same members of the public would no doubt complain just as bitterly if we were to admit Loss to the practice of law, and if he, through lies and deception, were to deprive someone of his liberty or property.

I regret that the unsatisfactory, accusatory language of the dissenting opinion has precipitated this needless controversy.

CLARK, C.J., and MORAN and MILLER, JJ., join in this special concurrence.

JUSTICE SIMON, dissenting:

"If the committee is of the opinion that the applicant is of good moral character and general fitness to practice law, it shall so certify to the Board of Law Examiners and the applicant shall thereafter be entitled to admission to the bar. If the committee is not of that opinion, it shall file with the Board of Law Examiners a statement that it cannot so certify, together with a report of its findings and conclusions." 107 Ill. 2d R. 708(c).

This is the first time this court has deviated from its own rules and case law by reviewing, *sua sponte*, a bar application and denying admission to an applicant the Committee on Character and Fitness has certified as fit to practice law. In so doing, the majority ignores this

court's prior decisions which limit review of the committee's findings to the "unlikely event that there has been an arbitrary refusal of a certificate [by the Committee on Character and Fitness]." (*In re Latimer* (1957), 11 Ill. 2d 327, 330, *cert. denied and appeal dismissed* (1957), 355 U.S. 82, 2 L. Ed. 2d 111, 78 S. Ct. 153; see also *In re Ascher* (1980), 81 Ill. 2d 485, 487.) In addition, the majority disregards the clear directive of Supreme Court Rule 708(c), which it shrugs off as "[u]nfortunate language" (119 Ill. 2d at 195). At the time of Loss' certification, that rule provided that upon the committee's certification of an applicant's "good moral character and general fitness \*\*\* the applicant *shall thereafter be entitled to admission to the bar.*" (Emphasis added.) (107 Ill. 2d R. 708(c).) Rule 708(c) has been amended effective August 1, 1987, but no one suggests the amendment applies to Loss. By its opinion the majority has significantly changed the admission process without first notifying applicant Loss, law students, the bar, and the public.

The majority justifies its decision to review Loss' application with the conclusory statement that to do otherwise would be both absurd and unconstitutional. It would be absurd, the majority states, because otherwise, "confronted with the record here, [we would be] powerless to consider the correctness of the decision to certify and would be required to blindly admit petitioner." (119 Ill. 2d at 194.) It would be unconstitutional, according to the court, "[t]o read literally the language of the rule" for the same general reason: to do so would "divest this court of jurisdiction to review the finding of the committee \*\*\* resulting in an unconstitutional delegation of our jurisdiction and an abdication of our duty to regulate the bar of this State." 119 Ill. 2d at 194-95.

What the majority overlooks in rejecting the clear and literal meaning of the rule is that the Committee on

Character and Fitness "is an arm of this court" (*In re Latimer* (1957), 11 Ill. 2d 327, 330), and our own rules provide that it is a proper delegation of authority to leave the issue of an applicant's character and fitness to the members of the committee acting as commissioners of this court. (See 107 Ill. 2d R. 709(b).) Endowing the committee with this authority under our carefully articulated rules hardly constitutes an abdication of our responsibility to oversee the bar. Of course, the court has the authority to alter or repeal its rules, but it did not bother to do so here until first departing from the existing rule. Due process demands that we follow our own rules while they remain in force, and they are binding on this court the same as on litigants. (*Harris v. Annunzio* (1952), 411 Ill. 124, 127; *cf. United States v. Nixon* (1974), 418 U.S. 683, 696, 481 L. Ed. 2d 1039, 1057, 94 S. Ct. 3090, 3101.) It is no answer to say that Mr. Loss has been afforded a hearing, for the *ad hoc* proceeding ordered by this court was itself fundamentally unfair. In their expressed desire to avoid an absurd and unconstitutional result, my colleagues have wrought just that.

Without explanation and on its own motion, the court issued an order on June 4, 1986, after the committee had already certified Loss as fit to practice law, "granting him leave" to file yet another petition (which he did not seek leave to file) for admission to the bar and allowing the Administrator of the Attorney Registration and Disciplinary Commission (the Administrator), who acted as attorney for the committee, leave to respond. The order, which also set a date for oral argument, was seriously deficient for several reasons.

It failed to advise Loss of how this matter even came before us. Nothing in the record indicates the source of the information which triggered this extraordinary proceeding. Such review has not taken place—in even a single instance—since I have been a member of this court.

Moreover, as the majority concedes, there are no formal procedures for keeping the court apprised of an applicant's interaction with the Committee on Character and Fitness. (119 Ill. 2d at 192-93.) The only way this court could have been advised of Loss' situation, therefore, was through an informal communication. The possibility that this unusual proceeding was initiated on the basis of rumors or gossip turns the entire admission process into a sham. It appears that those who can grab the court's ear and are displeased with an applicant can trigger an additional inquiry, by this court itself, into the applicant's moral character. To adequately address the question of his good character and fitness Loss has a right to know how and why his application was singled out for such special attention.

The June 4 order had another shortcoming: it failed to inform Loss of the specific issues to be addressed in the oral argument it commanded. The committee had already held a hearing in which argument was presented and witnesses subjected to extensive cross-examination. No one took exception to the committee's findings or its certification. If the purpose of the oral argument was to address the court's concerns—since it was the court itself which asked for further review—such concerns were never articulated. Loss was simply told to appear and to argue without any indication of what this court's role in the process would be, or what needed to be demonstrated before he could gain admission. When Loss appeared before us personally and offered to answer the court's questions, the court remained mute.

Since this court has never reviewed a grant of certification by the Committee on Character and Fitness, and since there is no provision for such review in our rules, we have never, as the majority acknowledges (119 Ill. 2d at 193), developed an appropriate standard for reviewing the committee's findings. In the majority's haste to find

one, it has slipped into another error. The majority summarily discards the standard for reviewing denials of certification—arbitrary action by the committee (119 Ill. 2d at 193)—and in its place concludes that to gain admission to the bar Loss must prove by clear and convincing evidence that he has been rehabilitated and is fit to practice law (119 Ill. 2d at 194). Putting aside for the moment the wisdom of requiring such stringent proof, the error in adopting this so-called standard is that it is not a standard of review at all, but rather a burden of proof. By confusing a standard of review with a burden of proof, I respectfully submit that the majority has turned an already unconstitutional proceeding into a morass of confusion.

The findings of an administrative agency, such as the Committee on Character and Fitness, are accorded a great deal of deference. With respect to the hearing panels of the Attorney Registration and Disciplinary Commission, for example, "[w]e have repeatedly said *** that the findings of those boards are 'entitled to virtually the same weight as the findings of any initial trier of fact.' " (*In re Wigoda* (1979), 77 Ill. 2d 154, 158, quoting *In re Hallett* (1974), 58 Ill. 2d 239, 250.) This is because the hearing panel alone has had the opportunity to observe the witnesses and judge the credibility of their testimony. (77 Ill. 2d 154, 158.) It is the party seeking to reverse the findings of the administrative body who has the burden of persuading the court on review that those findings are against the manifest weight of the evidence.

In the case before us no one, not the committee, not the Administrator, not Loss, has initiated any review of the committee's finding. It would be ridiculous to suggest that the court, which raised this issue *sua sponte*, ought to have this burden; but it is equally anomalous to place the burden on Loss. He has already convinced the committee below that he was fit to practice law and now

seeks only to maintain the findings of the court's own committee.

The majority suggests that the reason Loss is forced to meet such a heavy burden on review is because the showing made before the Character and Fitness committee was inadequate. According to the majority, instead of the showing all other applicants are required to meet, a "burden of proving good present moral character" (119 Ill. 2d at 195, citing *In re Ascher* (1980), 81 Ill. 2d 485, 498), the committee should have insisted because of his history that Loss show "by clear and convincing evidence *** that he is ready to ' "return" to a beneficial, constructive and trustworthy role' in society (*In re Wigoda* (1979), 77 Ill. 2d 154, 159), [and] that his rehabilitation is such that he is a fit person to practice law." (119 Ill. 2d at 195-96.) Waiting until Loss has presented his case to both the Committee on Character and Fitness and this court before announcing the applicable burden of proof is grossly unfair to Loss and violative of his due process rights because it fails to give him notice of what he must show. Further, the majority still leaves us in the dark with respect to the actual standard of review it thinks ought to be applied. Its decision here seems to approve of some aberrant form of *de novo* review where a decision is made without deference to the findings of the administrative body.

But even assuming that all of these procedures were proper, the heavy burden of proof the majority applies here is inappropriate. Proof by clear and convincing evidence is the same showing a disbarred attorney seeking reinstatement must demonstrate. Unlike the attorney petitioning for reinstatement, however, an applicant in Loss' position has never breached nor abused a position of public trust such as an attorney occupies. Considerations involved in determining whether to readmit a disbarred attorney to the practice of law, such as the im-

pact of the attorney's misconduct on the legal profession, the public, and the administration of justice, are not applicable here. See, *e.g., In re Zahn* (1980), 82 Ill. 2d 489, 493.

Further, it is difficult to justify such a burden of proof, a showing rarely required by either a court or an administrative agency, without good reason. Proof by clear and convincing evidence is required, for example, to void a will on the ground of fraud or undue influence. (See, *e.g., Weininger v. Metropolitan Fire Insurance Co.* (1935), 359 Ill. 584, 598.) The reason for requiring a strict showing is obvious. Not only is such evidence easy to fabricate, but the primary witness is, unfortunately, unavailable to testify. Similarly, we require a disbarred attorney to make this type of showing because he has previously misused the trust this court placed in him and has been found unfit to practice. Faced with that record, prudence requires an attorney seeking reinstatement to demonstrate by clear and convincing evidence that he is fit to be trusted. A review of the committee's grant of certification in favor of Loss, however, presents none of these problems. There has never been a finding of breach of the public trust which the petitioner seeks to overcome.

Even applying the inappropriate standard, however, the court is still obliged to admit Loss since he has demonstrated by clear and convincing evidence that he is rehabilitated and fit to practice law. At the hearing before the Committee on Character and Fitness, Loss presented 15 witnesses. This group of witnesses who attested to his good moral character and rehabilitation included the Honorable George N. Leighton, a judge of the United States District Court for the Northern District of Illinois, who serves with distinction on that court as he did on both the Illinois Appellate Court and the circuit court of Cook County, and who was a former chairman

of our Committee on Character and Fitness. Judge Leighton, who had the opportunity to supervise Loss when Loss participated in an extern program in law school, appeared in person before the committee and testified:

"Mr. Loss showed me in many ways on many occasions that he is trustworthy. I would highly recommend Edward Anthony Loss because of his outstanding qualities of character. In my judgment he has those traits with which experience will make him a great lawyer and a distinguished member of our profession."

Loss' last arrest occurred in 1975, more than 12 years ago. Within the past six years he not only completed law school with an outstanding record, but he also started his own business where he helped rehabilitate ex-convicts and ex-drug addicts by providing them with jobs. While, as the majority states, Loss was not totally candid about his past on his application to the DePaul College of Law, the dean of that school testified that Loss was fit to become a member of this bar. Besides, Loss' application to DePaul was filed in 1980, approximately seven years ago. Under our rules even an attorney who has been disbarred may file for reinstatement after five years. (107 Ill. 2d R. 767.) Therefore, his law school application should not preclude Loss from being admitted to the bar.

The Administrator presented no witnesses at the hearing before the committee. In denying Loss' application, the majority points out that his marriage was dissolved subsequent to the hearing. (119 Ill. 2d at 197.) How this is relevant to Loss' fitness to practice law escapes me. While I have no statistics on the number of divorced attorneys practicing in this State, I am certain that there are many. It would be preposterous to suggest that these attorneys should surrender their law licenses along with their marriage certificates as if, somehow,

the dissolution of their marriages obliterated their ability to competently practice law. It is equally absurd to assume the same with respect to Loss' divorce.

The majority also relies on information supplied by the Administrator subsequent to the hearing that *"if proved,* may be relevant to issues of rehabilitation and present good moral character." (Emphasis added.) (119 Ill. 2d at 197.) The newly discovered evidence which the Administrator argues revealed additional misrepresentations by Loss is a mortgage application and supporting documents executed by Loss on May 15, 1986. These documents, according to the Administrator, indicate that Loss is not destitute and establish that he was more than able to pay his attorney fees. Thus, the Administrator alleges that a letter Loss sent to the court on or about June 9, 1986, which prompted our voluntary offer to cover these costs, was a deliberate misrepresentation and demonstrates that Loss is unfit to practice law. The letter, which Loss wrote five days after the court advised him *sua sponte* that it had decided to review his application and hold oral argument, informed us:

> "Unfortunately, the financial exigencies of running a business and rearing a family preclude any further expenditures in the above captioned cause. Should the court see fit to award me costs and fees to pursue the matter further, I will certainly do so. Absent such an award, or *pro bono* intervention, I am unable to continue prosecution of the case. Accordingly, I ask to be sworn in, consistent with promulgated court rules, or, in the alternative, for a definitive finding by the court that I am not of good, present moral character based on the record of the case."

It was a matter of record before the committee that both Loss and his wife were gainfully employed and owned a home. Further, while the Administrator asserts that these documents establish Loss' net worth at

$209,000, other evidence indicates that he has liquid assets of approximately $4,000. But regardless of the exact amount of Loss' holdings, his reference to financial exigencies was not only a far cry from a claim of indigence, but also grossly inadequate proof of an intent to defraud this court. In my view, this letter was written in response to our decision to disregard both our case law and rules. It served simply to inform us of the choice Loss made: he decided not to expend any more of his resources in pursuing admission to the bar and would not participate in this highly exceptional proceeding unless we awarded either *pro bono* assistance or fees to offset the costs. The court responded by stating it would cover the fees and costs. Loss was entitled to make this choice, and there is no justification for seizing upon his communication to conclude, as the Administrator argues, that Loss intended to deceive this court. I fail to comprehend how the majority's decision to deny Loss admission to the bar on this ground can be supported under any rational concept of judicial review.

The information submitted to the court subsequent to the hearing is both unproved and irrelevant, and the omissions in Loss' application for admission to the bar are insignificant. Where the findings and recommendations of the committee are " 'based on uncontradicted and clear evidence,' they will be adopted." (*In re Wigoda* (1979), 77 Ill. 2d 154, 159, quoting *In re Phelps* (1973), 55 Ill. 2d 319, 322.) Since no evidence contradicts the committee's finding, even under the inappropriate standard the majority imposes there appears to be no fair basis for impeaching the committee's determination that Loss is fit to practice law.

The majority's final suggestion, inviting Loss to reapply immediately for admission (119 Ill. 2d at 197), strikes me as paradoxical. What showing could Loss make upon a reapplication other than what he has already submit-

ted? The court speaks of an inquiry into Loss' conduct since the hearing was held a year ago, but nothing before the court even hints at anything Loss has done in the past year which adversely reflects upon his fitness. Of what significance is the court's suggestion that the committee consider Loss' candor in filling out his new application when the majority concedes that his previous application was candid? (119 Ill. 2d at 191.) Finally, the majority suggests that if a new application is received, the committee consider Loss' candor in responding to whatever inquiry the committee makes. Yet there is no proof that Loss was less than candid when he testified before the committee last year. I fail to understand what could be accomplished by a new application except to further delay Loss' admission. In my opinion a second hearing would be a useless gesture.

Edward Anthony Loss will not be permitted to practice law in this State, not because he has failed to follow the rules, but because we have. The court's departure from any concept of fairness or regularity has been complete, and I would say, almost Kafkaesque. Mr. Loss was forced to appear at an inquiry of a type which has never been convened before or since to defend himself against unknown charges. Unfettered by a previously announced standard of review or any rules as to admissibility of evidence, the court has now determined, not surprisingly, that its initial concerns as to Loss' fitness were justified. The court has misused its authority, and I dissent.